933 A.2d 447

**Darren Joseph TATE**

v.

**STATE of Maryland.**

No. 0284, Sept. Term, 2006.

Court of Special Appeals of Maryland.

Sept. 27, 2007.

Celia A. Davis (Nancy A. Forster, Public Defender, on brief), for appellant.

Carrie J. Williams (Douglas F. Gansler, Atty. Gen., on brief), for appellee.

Panel MURPHY, C.J., LAWRENCE F. RODOWSKY (retired, specially assigned) and CHARLES E. MOYLAN, JR., (retired, specially assigned), JJ.

MOYLAN, J.

The primary subject of this appeal is the legal effect of inconsistent verdicts, especially jury verdicts consisting of a conviction and an acquittal. The appellant, Darren Joseph Tate, was convicted by a Prince George's County jury, presided over by Judge Graydon S. McKee, III, of the sexual abuse of his 16–year–old stepdaughter. In this appeal he raises the two contentions

1. that Judge McKee, in two respects, erroneously failed to take all necessary measures to preclude the jury from returning allegedly inconsistent verdicts; and

2. that Judge McKee erroneously restricted his cross-examination of the complaining witness, Koree Buffington.

### The Alleged Inconsistency

The appellant was indicted on three charges: 1) sexual child abuse, 2) a sexual offense in the fourth degree, and 3) second-degree assault. The jury acquitted the appellant of second-degree assault, and that verdict is not a factor on this appeal.

The jury also acquitted the appellant of the fourth-degree sexual offense, and that verdict is a big factor. The appellant contends that that acquittal was logically inconsistent with the jury's having convicted him of sexual child abuse of his stepdaughter because both charges were based on allegedly identical conduct.

■ The appellant concedes, at the outset, that logically inconsistent verdicts by a jury, unlike logically inconsistent verdicts by a judge sitting without a jury, are not in themselves a basis for reversing a conviction. *Hoffert v. State,* 319 Md. 377, 383–85, 572 A.2d 536 (1990); *Shell v. State,* 307 Md. 46, 52–58, 512 A.2d 358 (1986); *Ford v. State,* 274 Md. 546, 551–56, 337 A.2d 81 (1975); *Leet v. State,* 203 Md. 285, 294, 100 A.2d 789 (1953); *Price v. State,* 172 Md.App. 363, 388–90, 915 A.2d 432 (2007); *Hudson v. State,* 152 Md.App. 488, 513–16, 832 A.2d 834, *cert. denied,* 378 Md. 618, 837 A.2d 928 (2003).

Unable to attack the alleged inconsistency directly, the appellant attempts to do so indirectly. He contends initially that Judge McKee failed to take adequate steps to forestall the inconsistent verdicts when he denied the appellant's request to rearrange the verdict sheet so as to require that the jury first reach a verdict on the fourth-degree sexual offense with the attendant instruction that if they reached a not guilty verdict on that charge, they would not even consider the sexual child abuse charge.

The appellant's second indirect attack is on Judge McKee's jury instructions. Although the appellant made no such request at the time, he now contends that Judge McKee was nonetheless in error for failing, *sua sponte,* to tell the jury:

> You may not find the Defendant guilty of sexual abuse unless you are convinced beyond a reasonable doubt that he is guilty of committing a sexual offense in the fourth degree.

### Factual Background

The victim, Koree Buffington, had just turned 16 years of age when the act of alleged child abuse took place. She was

17 years old at the time of trial. The appellant is her stepfather, with whom Koree had been living as part of the same household. The household consisted of Koree, her mother, the appellant, Koree's grandmother, Koree's sister, a cousin, and a nephew. According to Koree herself, she and the appellant had always had a "close" relationship with each other. She described how they would regularly "hang out and just ride to school together" and how "they would joke and play-fight with one another."

In her trial testimony, Koree described the abusive incident. On a day several days after Koree's 16th birthday, the appellant knocked on Koree's bedroom door and she told him to come in. "After he came in, I was like sitting on the floor and he then pulled me up and put my hands around him, and he started touching me." She testified that the appellant placed her hands around his neck and then "he like took my hands down, and I hugged him like around where his waist was." Koree's critical testimony was that while the appellant was holding her, he put his hands inside her underwear. "He started rubbing outside my vagina." After that, the appellant "just started hugging me, and told me he loved me, and left." [1]

Koree believed that while this incident was taking place, her mother was in her bathroom and her grandmother was in her room in the basement. After the appellant left her room, Koree called a girlfriend and told her what had occurred. She did not, however, tell her mother or anyone else in the household "because nobody would believe me." Koree elaborated that while she had a "playful relationship" with the appellant, it was "not O.K. for him to kiss her." She added that she did not believe that the appellant was trying to hurt her.

This entire incident came to the attention of the authorities through the medium of Khadijah Tribble. Ms. Tribble worked

---

**1.** For his actions, the appellant was sentenced to a term of imprisonment for 12 years. The appellant does not question its proportionality or challenge the sentence in any other way. Other than taking note of it, we have no occasion to discuss the sentence.

at the Covenant House in Washington, D.C., where Koree participated in an after-school program. The version of the event that Koree recounted to Ms. Tribble differed, at least in detail, from the version Koree testified to at trial. She told Ms. Tribble that "she was asleep when her step-father came into the room, and that he got on top of her and tried to kiss her. She said that her clothes were on, and that he tried to fondle her, or did fondle her." After hearing this from Koree, Ms. Tribble, on her own initiative, reported it to the Prince George's County authorities.

Ms. Tribble went further and actually spoke with the appellant in an effort "to try to intervene; [to] provide additional services and resources for them." According to Ms. Tribble, the appellant neither admitted nor denied the accusation. According to her testimony, "[H]e did share the possibility [that] if there's anything he's guilty of, its playing rough with his daughters or sometimes not knowing when enough is enough."

The third and final State's witness was Detective Wayne Pyles, who reported the responses of the appellant when confronted with the accusation. In a written statement, the appellant averred that he had no recollection of ever having touched his stepdaughter's breast or vagina. The appellant added a message to Koree in which he said:

Because what you said happened, I'm so sorry. I love you. Daren.

When Detective Pyles then asked the appellant if he was "apologizing to Koree because you fondled her breasts and vagina?," the appellant declined to answer because, he told the detective, "the word 'fondled' implied a sexual intent." The appellant told Detective Pyles that "Koree was not lying," but that he steadfastly denied doing "anything of a sexual connotation."

The appellant took the stand in his own defense. He denied having touched Koree outside of her vagina or in any sexual manner. He explained:

My relationship with Koree has been very, well, inappropriate. I was not acting like an adult. I was acting more like a peer, and I guess I acted like a peer to try to be accepted [by] a step-daughter.

The appellant elaborated that he knew that initially Koree "didn't really want me and her mother to be married," and that, in an effort to overcome that initial coolness, he made a special effort to be nice to her and to be her friend. He added that Koree was very "tomboyish" and physical and that, in interacting, the two of them would wrestle, box, and "we would touch." He did not deny touching Koree because, as he explained, "We play all the time, for me to say I have never touched her would be for me to just outright lie." He further explained that he wrote the apology to Koree after speaking with Detective Pyles "because it deeply hurt me to think that she took anything, or our playing, in any kind of sexual way." He concluded that the incident in question did not happen in the way that Koree reported it. The two of them were "just playing at the time."

Jocelyn Alexander–Tate, Koree's mother and the appellant's wife, testified for the defense. She had been married to the appellant for three years, and Koree had lived with them "off and on for two years." She testified that the relationship between the appellant and Koree typically involved "a lot of roughhousing. They were kind of like peers." The mother had never interpreted the interaction between the appellant and Koree as being sexual in any way.

Also testifying for the defense was Kiana Simmons, the appellant's 18–year–old daughter. She explained that Koree had a very different relationship with her father than she herself did. "She was real cool with him; like they played a lot, and they would joke and stuff." Ms. Simmons testified that she had never observed any behavior of a sexual nature between the two.[2]

---

2. The appellant has not challenged the legal sufficiency of the evidence to sustain his conviction for sexual child abuse, and we, therefore, have

### The Verdicts Were Not Necessarily Inconsistent

A frequent defense to a contention based on inconsistent verdicts and one of the State's alternative defenses in this case is that the verdicts were not actually inconsistent and, on close examination, can be reconciled. The area of factual disagreement between the State and the defense is narrow. It is not nearly so much a disagreement over what happened as it is a disagreement over the significance of what happened. The gravamen of the State's case against the appellant, both for the sexual abuse of a minor pursuant to Maryland Code, Criminal Law Article, § 3–602(b), and for the fourth-degree sexual offense pursuant to § 3–308(b)(1), is Koree's testimony that the appellant put his hands in her underwear and "started rubbing outside my vagina." That is the limited factual fulcrum upon which guilt or innocence for either of the criminal charges turns. It was that act of "rubbing outside [Koree's] vagina" that was the *sine qua non* of the appellant's sexual abuse of Koree. It was that act of "rubbing outside [Koree's] vagina" that was the *sine qua non* of the appellant's non-consensual sexual contact with Koree that allegedly constituted a fourth-degree sexual offense.

From that predicate of a common factual basis for the two crimes, the appellant constructs his thesis that 1) the jury's conviction of him for sexual child abuse necessarily meant that the jury was persuaded beyond a reasonable doubt that the appellant did, indeed, "rub outside Koree's vagina" but 2) the jury's acquittal of him for the fourth-degree sexual offense necessarily meant that the jury was not persuaded beyond a reasonable doubt that he had "rubbed outside Koree's vagina." As the appellant characterizes the verdicts, the jury was at one and the same time both convinced that "he did it" but not convinced that "he did it." According to the appellant, the jury reached diametrically opposed and inconsistent verdicts that cannot be reconciled and Judge McKee was in error for failing to take sufficient steps to forestall such inconsistency.

no occasion to consider that issue. See *Davis v. DiPino,* 337 Md. 642, 647–48, 655 A.2d 401 (1995).

The appellant's characterization of the verdicts, however, is much too simplistic. The flaw in the appellant's logic is that one of the premises on which he relies is not necessarily true. The acquittal of the appellant for a fourth-degree sexual offense does not, even on the particular facts of this case, necessarily mean that the jury was not persuaded beyond a reasonable doubt that the appellant had "rubbed outside Koree's vagina." Even given the jury's persuasion of that predicate fact, a fourth-degree sexual offense may require something more. The acquittal on the fourth-degree sexual offense charge could well have come about for either of two different and arguably plausible reasons. One concerns the *actus reus* of a fourth-degree sexual offense. The other concerns its *mens rea.*

Our analysis begins with the general proposition that sexual child abuse is broader than, *inter alia,* even a closely related sexual offense and that, granted a substantial overlap in coverage, may be established even though the related sexual offense has not been completely established. Section 3–602(a)(4) defines sexual child abuse as follows:

(4)(i) "Sexual abuse" means an act that involves sexual molestation or exploitation of a minor, whether physical injuries are sustained or not.

(ii) *"Sexual abuse" includes:*

1. incest;

2. rape;

3. *sexual offense in any degree;*

4. sodomy; and

5. unnatural or perverted sexual practices.

(Emphasis supplied).

■ The appellant is correct that the only one of those included examples of sexual abuse that is close to being pertinent in this case is a sexual offense in the fourth degree. Being close to being pertinent, however, is not the same as actually being pertinent. Although "sexual abuse" includes those five statutorily listed examples, it most definitely is not

limited to those examples. Judge Cathell was very clear on that point in *Degren v. State*, 352 Md. 400, 428, 722 A.2d 887 (1999):

> Section 35C(a)(6)(ii) [the substantively unchanged predecessor to what is now § 3–602(a)(4) of the Criminal Law Article] enumerates actions describing types of sexual abuse, but *the general phrase, "Sexual abuse includes, but is not limited to" precedes the enumerated list and states specifically that the list is not exhaustive.* Furthermore, given general legislative policy and the purpose of the child abuse statute to protect minors from abuse, *we find it difficult to believe the General Assembly chose to limit the forms of sexual abuse punishable to only those listed in section 35C(a)(6)(ii).*

(Emphasis supplied).

To be sure, the earlier version of the child abuse law, Art. 27, § 35C(a)(6)(ii), stated that sexual abuse "includes, but is not limited to" the examples then listed, whereas the new codification, Criminal Law Article, § 3–602(a)(4), merely precedes the list of examples with the word "includes." The Special Revisor's Note to the 2002 recodification, however, expressly points out that although there have been minor changes in wording, there has been no change in substance in the course of moving the offense from Article 27 to the Criminal Law Article. "Includes" still means "includes but is not limited to."

In *Nightingale v. State*, 312 Md. 699, 708, 542 A.2d 373 (1988), the Court of Appeals also recognized that the definition of sexual child abuse is broader than the collective definitions of the statute's list of representative examples of sexual child abuse.

> The problem, then, is that we cannot tell whether these general verdicts of guilty were based on the use of sexual offenses as lesser included offenses (or elements) of child abuse, or *whether the child abuse verdicts were based on other reasons (e.g., some sort of sexual molestation which*

*the juries thought did not rise to the level of a sexual offense in any degree.)*

(Emphasis supplied).

There may be the commission of sexual child abuse even if none of the five related offenses statutorily listed as examples of sexual child abuse has been committed. The non-commission of so much as a single one of the latter does not necessarily imply the non-commission of the former.

██ Our first examination will be a comparison between the *actus reus* of sexual child abuse and the *actus reus* of a fourth-degree sexual offense, even in the limited context of allegedly illegal behavior consisting of an intentional touching by the defendant of a part of the victim's body. Is the one *actus reus* necessarily coterminous with the other? All that is required for a touching to constitute sexual abuse is that it could be deemed to involve the "sexual molestation or exploitation of a minor." That is open-ended language.

The touching that may constitute a fourth-degree sexual offense, by contrast, is more tightly defined. It is spelled out by § 3–308(a):

(a) *Prohibited.*—A person may not engage in:

(1) sexual contact with another without the consent of the other.

Section 3–301(f), in turn, gives us a definition of what "sexual contact" consists of:

(f) *Sexual contact.*—(1) "Sexual contact", as used in §§ 3–307 and 3–308 of this subtitle, means *an intentional touching of the victim's or actor's genital, anal, or other intimate area* for sexual arousal or gratification, or for the abuse of either party.

(2) "Sexual contact" includes *an act:*

(i) *In which a part of an individual's body,* except the penis, mouth or tongue, *penetrates, however slightly, into another individual's genital opening* or anus; and

(ii) That can reasonably be construed to be for sexual arousal or gratification, or for the abuse of either party.

(3) *"Sexual contact" does not include:*

(i) *A common expression of familial or friendly affection.*
(Emphasis supplied).

Clearly there was no suggestion in this case that any part of the appellant's body ever penetrated, however slightly, into Koree's genital opening and subsection (2) can, therefore, be factored out of any further consideration. The single, fleeting testimonial reference to "rubbing outside my vagina" does not tell us with anatomical exactitude precisely what that entailed. In terms of the *actus reus,* it is possible, indeed probable, that the appellant's intentional "rubbing outside Koree's vagina" constituted an intentional touching of Koree's genital area, but that is not absolutely free of all uncertainty. We are mindful of the caution displayed by Judge Wilner in *Cooksey v. State,* 359 Md. 1, 24 n. 1, 752 A.2d 606 (2000), as he questioned whether "touching a person's buttocks" or *"rubbing* against the victim" amounted to sexual contact even though those actions might clearly represent "sexual molestation or exploitation" so as to constitute sexual child abuse.

Section 461(f) of Article 27 [from which § 3–301(f) derives without substantive change] includes within the definition of "sexual contact" *the intentional touching of the victim's anal or genital areas* or other "intimate parts" for the purpose of sexual arousal or gratification. *Whether the touching of a person's "buttocks" would suffice as sexual contact is not clear. It might,* however, depending on the circumstances, *constitute sexual molestation or exploitation, even if it did not constitute sexual contact. The same situation could arise from "rubbing against" the victim.*
(Emphasis supplied).

There was no conviction for the fourth-degree sexual offense in this case, and we are not, therefore, called upon to resolve the still unresolved scope of the term "sexual contact." It is enough for us to note that one or more of the jurors might possibly have concluded, rightly or wrongly, that "rubbing outside the vagina" did not constitute sexual contact within the contemplation of a fourth-degree sexual offense law even

though it may have constituted "sexual molestation or exploitation" within the contemplation of the sexual child abuse law. That possibility would eliminate any inconsistency between the conviction for sexual child abuse and the acquittal for a fourth—degree sexual offense.

■ The potential difference between a fourth-degree sexual offense and sexual child abuse is even more pronounced when we turn our focus on the *mens rea* of each offense. The sexual abuse of a minor pursuant to § 3–602 does not involve any specific intent or special *mens rea*. An act of sexual contact, within the contemplation of §§ 3–301(f), 3–307, and 3–308, by contrast, requires the proof of a very particularized specific intent or special mens rea. The intentional touching, whatever its scope, must be perpetrated "for sexual arousal or gratification, or for the abuse of either party." § 3–301(f)(1). There is no comparable mental requirement in the sexual child abuse law.

In looking at all of the evidence in this case, there is a strong possibility that the jury (or some of the jurors) could well have concluded that the appellant's unrestrained behavior may have amounted to sexual child abuse but that he did not harbor that specific intent of acting for "sexual arousal or gratification" necessary for a fourth-degree sexual offense. Although he did not remember having done so, the appellant freely acknowledged that, in the course of playful roughhousing, he may well have touched Koree inappropriately but he forcefully disclaimed any sexual purpose or orientation in his actions.

On the stand, the appellant disclaimed any sexual purpose or intention. To Khadijah Tribble the appellant disavowed any sexual intent in his roughhousing with Koree. To Detective Pyles the appellant vigorously denied having "a sexual intent" or "anything of a sexual connotation." Koree herself acknowledged the ongoing "playful relationship" between them and stated her belief that the appellant was not trying to hurt her. Koree's mother confirmed that the relationship between the appellant and Koree involved "a lot of roughhous-

ing" but that, over the course of three years, she had never observed any interaction of a sexual nature between them. Kiana Simmons characterized the relationship precisely as had Koree's mother.

It takes no stretch of the imagination to conclude that the jury may have found the appellant's behavior to have been inappropriate but may also have believed the appellant that his actions were not motivated by "sexual arousal or gratification." All that would be required, of course, is that the jury (or some of the jurors) were not persuaded beyond a reasonable doubt that his actions were specifically intended "for sexual arousal or gratification." That, indeed, was the heart of the appellant's defense, to wit, that he may have touched Koree inappropriately but that he did not do so for sexual purposes. The very success of the appellant's defense may well be the obvious explanation for the appellant's acquittal on the fourth-degree sexual offense charge, notwithstanding his conviction for sexual child abuse. The appellant worked hard for that allegedly inconsistent verdict and should be happy in his success.

Our conclusion is that the two verdicts were not necessarily inconsistent at all. With the failure of the appellant's central thesis, his indirect attack on the inadequacy of Judge McKee's preventive measures self-evidently founders. There was nothing inconsistent and, therefore, nothing even arguably erroneous about the verdicts. The appellant's indirect attack on what Judge McKee did or did not do, therefore, reduces itself to the claim that Judge McKee failed to take all necessary measures to prevent non-error. That is simply not a cognizable appellate contention.

■ The subcontention that Judge McKee should have reconfigured the verdict sheet so that the jury should first consider the fourth-degree sexual offense charge and then be told that if it returned a verdict of not guilty on that charge, it should not even consider the charge of sexual child abuse is without a shred of merit. For all of the reasons we have discussed, such advice would have been wrong. The jury

might logically convict of sexual child abuse notwithstanding an acquittal for the fourth-degree sexual offense.

Similar advice in the course of jury instructions, to the effect that an acquittal on the fourth-degree sexual offense charge would compel an acquittal on the sexual child abuse charge, would have been equally wrong. It is redundant further to point out that such a jury instruction was never even requested and that this entire subcontention, meritless as it otherwise may be, has not been preserved for appellate review.

## Inconsistent Verdicts: An Overview

The appellant cannot prevail on this first and primary contention about inconsistent verdicts for another and totally independent reason. Even if, purely *arguendo*, everything we have said to this point were wrong and the two verdicts were, indeed, as inconsistent as inconsistent can be, it would still make no difference to the outcome of this case.

In multi-count and multi-indictment trials, we agree with the appellant that a neat and orderly set of logically consistent verdicts is highly commendable and always to be desired. In jury trials and court trials alike, however, the actual result frequently falls short of that aspiration. The question then becomes one of what relief, if any, should be deemed necessary and appropriate.

The alleged inconsistency between the jury's verdicts in this case haunts the appellant. He insists upon logical consistency as the Holy Grail, and for him any lesser quest is unworthy. For the State, on the other hand, a demand for a consistency in verdicts at all costs is not only foolish, it is the dreaded exemplar of Emerson's "hobgoblin."[3] Our overview may appropriately begin with the observation made by Judge Digges for the Court of Appeals in *Ford v. State*, 274 Md. 546, 551, 337 A.2d 81 (1975):

---

**3.** See Ralph Waldo Emerson, *Essays: First Series, Self Reliance:* "A foolish consistency is the hobgoblin of little minds."

In answering Ford's second contention it is only necessary for us to emphasize that *this "hobgoblin" of what appears to be jury verdict inconsistency, which haunts the petitioner in this case, has long been exorcised* not only by this Court but also by many other courts across this nation.

(Emphasis supplied).

## A. Inconsistency Between Convictions

An overview of inconsistency presents not a single picture but a variegated one. Like Caesar's Gaul, it is divided into three parts, and, doctrinally speaking, those distinct provinces are almost independent countries. The rules that are applicable and the language that is appropriate in one do not always travel well into the others. An inconsistency opinion tempted to borrow a statement or a principle from another inconsistency opinion, therefore, should be extremely cautious first to identify the specific sub-context in which the earlier statement was made. The three subdivisions are not necessarily fungible.

Traditionally, a distinction has always been made between 1) two inconsistent convictions and 2) a conviction and an inconsistent acquittal. The Court of Appeals condemned the rendering of two inconsistent convictions in *Heinze v. State*, 184 Md. 613, 42 A.2d 128 (1945). In the days before Maryland's 1978 Consolidated Theft Law, a defendant could not for the same act be both a thief and a receiver of stolen goods. A set of verdicts that proclaimed him to be both was necessarily illogical. There was no alternative explanation.

It is unquestioned that *a finding of guilty on two inconsistent counts is invalid.* Thus, where a defendant is charged in one count with larceny and in another count with receiving stolen goods, and it plainly appears that the property alleged to have been stolen is that also alleged to have been received, a general verdict of guilty is fatally defective, because *in law a thief cannot be guilty of the crime of receiving stolen goods which he himself has stolen, and a guilty receiver of stolen goods cannot himself be the*

*thief, and hence the defendant could not be guilty on both counts.*

*Id.* at 617, 42 A.2d 128 (emphasis supplied). See also *Henry v. State,* 273 Md. 131, 137–38, 328 A.2d 293 (1974); *Tucker v. State,* 237 Md. 422, 425, 206 A.2d 691 (1965); *Fabian v. State,* 235 Md. 306, 313–14, 201 A.2d 511 (1964); *Fletcher v. State,* 231 Md. 190, 193, 189 A.2d 641 (1963); *Young v. State,* 220 Md. 95, 100, 151 A.2d 140 (1959); *Jenkins v. State,* 59 Md.App. 612, 618, 477 A.2d 791 (1984) ("An intent to maim, disfigure, or disable necessarily falls short of, and thus excludes, an intent to kill.").

Even in the case of two inconsistent convictions, however, neither of the verdicts will be disturbed on appeal if 1) the defendant failed to make timely objection to the inconsistency at the time the verdicts were rendered and 2) no real prejudice can be shown, to wit, something more than simply an inconsistency in the abstract. Because the prejudice possibly arising out of inconsistent convictions would consist of either multiple sentences or an excessive sentence on one of the convictions, no real prejudice would result if 1) only a single sentence were imposed and 2) that sentence was within the range of sentencing available for the lesser of the two convictions. *Hardesty v. State,* 223 Md. 559, 562, 165 A.2d 761 (1960); *Bell v. State,* 220 Md. 75, 80–81, 150 A.2d 908 (1959); *Novak v. State,* 139 Md. 538, 115 A. 853 (1921); *Dickens v. State,* 175 Md.App. 231, 243–45, 927 A.2d 32 (2007).

It is here, in the distinct context of *inconsistent convictions,* that the factor of "where real prejudice is shown" may have a bearing on the preservation requirement with respect to jury instructions. The "real prejudice" that must be shown to "trump" the preservation requirement is, as the above cases all demonstrate, either 1) multiple sentences or 2) a sentence in excess of that allowable for the lesser of the two convictions. Such prejudice is unambiguous and undeniable.[4]

---

4. The kind of "real prejudice" that these cases refer to does not even exist in the very different context of an inconsistency between a jury

Even in such a case, however, as *Jenkins v. State,* 59 Md.App. at 622, 477 A.2d 791, illustrates, the necessary by-passing of the preservation requirement is through the notice of "plain error" pursuant to Maryland Rule 4–325(e).

This case presents that very circumstance noted in the footnote in *Bell, supra,* 220 Md. at 81, 150 A.2d 908. *The court not only imposed separate sentences on both convictions, but the twenty-five year sentence meted out for assault with intent to murder far exceeded the ten-year maximum allowed for assault with intent to maim, disfigure, or disable. Clearly, there was prejudice here, and it is of sufficient magnitude to require that we exercise our discretion under [Rule 4–325(e) ] and take cognizance of the error.*

█ There is an almost unbridgeable divide between the case of an inconsistency between two convictions (by judge or jury), on the one hand, and an inconsistency between a jury's conviction and a jury's acquittal, on the other hand. In the case of inconsistent convictions, the fact finder has necessarily and affirmatively found two things that are unquestionably irreconcilable. There is nothing to speculate about, and such an incongruous result is flatly prohibited. As the caselaw has been pointing out for 75 years, however, there are a number of plausible explanations for an apparently inconsistent acquittal by a jury and the law does not mandate a reversal based on mere speculation as to what the actual explanation may have been. In the one case, appellate review is rigid. In the other case, it is extremely indulgent.

These two species of inconsistency are so inherently different that doctrinal cross-fertilization is problematic in the extreme. Statements made in the context of inconsistent conviction cases may have no applicability at all in the very different world of an inconsistency between a jury's conviction and a jury's acquittal. Pronouncements quite correctly made

conviction and a jury acquittal. In such a case, there is only a single sentence.

in the first context can be treacherous if uncritically misapplied in the second. Such a doctrinal transplant does not always take.

In the present case, however, we are not dealing with inconsistent convictions.

## B. Inconsistent Verdicts By a Judge Versus Inconsistent Jury Verdicts

Traditionally the law has also always looked with a far more jaundiced eye on inconsistent verdicts returned by a trial judge sitting without a jury than on inconsistent verdicts returned by a jury. As will be more fully discussed, there are a number of plausible and readily understandable reasons why a jury may render inconsistent verdicts and why the law is accordingly indulgent. With trial judges, by stern contrast, the law marks the judge's paper with rigorous scrutiny.

The pioneering analysis of this distinction in treatment was the opinion of Judge Henry Friendly for the United States Court of Appeals for the Second Circuit in *United States v. Maybury*, 274 F.2d 899 (2d Cir.1960). In a court trial, the United States District judge had unquestionably rendered inconsistent verdicts when, on the evidence in that case, he acquitted the defendant of forgery but convicted him of uttering a forged check knowing it to be forged. The Government defended against the claim of inconsistency by relying on *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932) and *Steckler v. United States*, 7 F.2d 59 (2d Cir.1925), in which the Supreme Court and the Second Circuit respectively had tolerated inconsistent verdicts returned by juries. The Government sought analogous treatment for inconsistent verdicts returned by a judge.

> The government says that, under our decision in *Steckler v. United States*, and the Supreme Court's approval of this in *Dunn v. United States*, inconsistency in the disposition of counts in an indictment is without legal significance. *Recognizing that these cases dealt with inconsistencies in a jury verdict, the government contends the same principle ought*

*be applied when a criminal indictment has been tried to a judge.*

274 F.2d at 902 (emphasis supplied).

Judge Friendly's response began with the recognition that certain considerations that apply in the case of a jury trial do not necessarily apply to the case of a bench trial.

The *Steckler* and *Dunn* opinions show on their face that *the decision to ignore inconsistencies in the verdict of a jury in a criminal case was based on special considerations relating to the nature and function of the jury* in such cases rather than on a general principle to be applied even when these considerations were absent.

*Id.* (emphasis supplied).

One of the classic explanations for jury inconsistency is the power of the jury, even in the face of logic, to extend lenity to a defendant. Fearful that multiple convictions, even if logically compelled, might result in multiple punishment, a jury may arbitrarily return a single conviction and then choose to let it go at that. A jury may simply refuse to "pile on" a defendant even if logic seems to demand it.[5] The *Maybury* opinion described this jury tactic for promoting lenity.

The vogue for repetitious multiple count indictments may well produce an increase in seemingly inconsistent jury verdicts, where *in fact the jury is using its power to prevent the punishment from getting too far out of line with the crime.*

*Id.* (emphasis supplied).

While the law indulges the jury's indirection as a way of avoiding excessive punishment, whether that is properly the jury's concern or not, there is no necessity to resort to such an outflanking maneuver in the case of a court trial.

While the historic position of the jury affords ample ground for tolerating the jury's assumption of the power to insure

---

5. As Justice Holmes noted in *Horning v. District of Columbia,* 254 U.S. 135, 138, 41 S.Ct. 53, 65 L.Ed. 185 (1920), "[T]he jury has the power to bring in a verdict in the teeth of both law and facts."

lenity, the judge is hardly the "voice of the country," even when he sits in the jury's place. *If he deems an indictment multiplicious,* he has only to say so, and *the time for him to exercise any "lenity" that he deems warranted is on sentence.*

*Id.* at 903 (emphasis supplied).

A second classic explanation for jury inconsistency is the necessary compromising that may be required in order for a jury to reach a unanimous verdict. "I will agree, reluctantly, to a conviction on Count One only if you begrudge me an acquittal on Count Two." "Done! We've got a verdict." Judge Friendly described such compromising as perhaps the necessary price to be paid for the luxury of trial by jury.

*Ignoring inconsistency in a jury's disposition* of the counts of a criminal indictment *may thus be deemed a price for securing the unanimous verdict* that the Sixth Amendment requires. *Steckler* and *Dunn* thought it not too high a price for "the most transcendent privilege which any subject can enjoy or wish for."

*Id.* (emphasis supplied).

Once again, however, there is no price that needs to be paid to achieve unanimity in the case of a verdict rendered by a judge alone.

*There is no need to permit inconsistency* in the disposition of various counts *so that the judge may reach unanimity with himself;* on the contrary, he should be forbidden this easy method for resolving doubts. We do not believe we would enhance respect for law or for the courts by recognizing for a judge the same right to indulge in "vagaries" in the disposition of criminal charges that, for historic reasons, has been granted the jury.

*Id.* (emphasis supplied). A judge's verdicts are not permitted to be schizophrenic.

Maryland first recognized the *United States v. Maybury* distinction between a jury's inconsistency and a judge's inconsistency in *Johnson v. State,* 238 Md. 528, 209 A.2d 765 (1965). *Johnson* managed to distinguish *Maybury* because the judge

in *Johnson* had provided a full and rational explanation for what, absent such explanation, might otherwise have appeared to be an inconsistent acquittal of what looked like, but actually was not, a lesser included count. The *Johnson* court nonetheless recognized the validity of the distinction between jury trials and court trials, as it quoted liberally from *Maybury* and placed its imprimatur on Judge Friendly's opinion as "lucid and scholarly." 238 Md. at 543, 209 A.2d 765.

In *Shell v. State*, 307 Md. 46, 512 A.2d 358 (1986), the Court of Appeals held squarely that, in a court trial, it was fatally inconsistent to convict a defendant of using a handgun in the commission of a felony or crime of violence while at the same time acquitting him, because of his inability to form the necessary specific intent, of the underlying felony or crime of violence. When the State sought to rely on *Ford v. State*, 274 Md. 546, 337 A.2d 81 (1975), which had permitted such an inconsistency in the course of jury verdicts, Judge Eldridge focused on the critical distinction.

In the present case, however, the inconsistent verdicts were rendered by a judge, not by a jury. The *Ford* holding does not justify inconsistent verdicts from the trial judge.

307 Md. at 55, 512 A.2d 358.

The Court of Appeals in *Shell* followed *Johnson v. State, supra,* and the opinion of the Second Circuit in *United States v. Maybury.* The inconsistency in the verdicts by the judge was accordingly fatal.

The case at bar is not one in which there is only an apparent inconsistency which in substance disappears upon review of the trial court's explanation. Unlike the situation in *Johnson, the trial court's findings in this case are not consistent with the challenged guilty verdict.* ... In the instant case ... the trial court found that the defendant did not commit the felony or crime of violence which is an element of the handgun charge. *If the defendant lacked the required mens rea to have committed the predicate felony*

*or crime of violence, as the court found, then an element or "prerequisite" of the § 36B(d) handgun offense was lacking.*

307 Md. at 57–58, 512 A.2d 358 (emphasis supplied).

In *Stuckey v. State,* 141 Md.App. 143, 784 A.2d 652 (2001), Judge Davis's opinion for this Court made it clear that, in a court trial, the conviction of the defendant for involuntary manslaughter of the gross negligence variety and the acquittal of the defendant for negligent driving were fatally inconsistent. The opinion built upon *Shell v. State, Johnson v. State,* and *United States v. Maybury* and concluded:

> Pursuant to § 388, *"grossly negligent"* operation of a motor vehicle is clearly an element of the crime of manslaughter by automobile. By its terms, *grossly negligent* driving involves a higher degree of negligence than does *mere negligent* driving. Therefore, [if] one [was] convicted of a crime of which *grossly negligent* driving was an element, he or she would also be guilty of *negligent* driving.
>
> Appellant, acquitted of the charge of negligent driving, was subsequently convicted of manslaughter by automobile. Appellant's guilt of manslaughter by automobile was predicated on grossly negligent driving, which rendered him irrefutably guilty of the lesser offense of negligent driving. The verdicts were inconsistent.

141 Md.App. at 159–60, 784 A.2d 652 (emphasis in original).

In the present case, we are not dealing with inconsistent verdicts rendered by a judge.

## C. Inconsistent Jury Verdicts of Conviction and Acquittal

This third species of inconsistent verdicts is involved only 1) when the inconsistency is between a conviction and an acquittal and 2) when both verdicts have been rendered by a jury. See *Galloway v. State,* 371 Md. 379, 401, 809 A.2d 653 (2002) (In a hybrid trial mingling court and jury verdicts, "the reasons why inconsistent jury verdicts are tolerated simply do not apply where a judge is involved in rendering one of the inconsistent verdicts.").

■ The first meaningful analysis of why inconsistent jury verdicts, when the alleged inconsistency is between a conviction on one charge and an acquittal on a related charge, are generally accepted was the opinion of Judge Learned Hand for the Second Circuit Court of Appeals in *Steckler v. United States*, 7 F.2d 59 (2d Cir.1925). The Second Circuit was confronted with an undeniable inconsistency in the jury's verdicts.

> There is a plain inconsistency in saying that the liquors were kept for sale, and in saying that the shop in which they were was not one in which the same liquors were kept for sale. *We cannot*, therefore, *avoid the question whether this inconsistency invalidated the verdict of guilty* on count 2.

*Id.* at 60 (emphasis supplied).

The Court was really plowing new ground, for as Judge Hand observed:

> No doubt it has generally been assumed that, if the verdict was rationally inconsistent, the conviction ought not to stand, and probably that was the common law, though it is hard to find a case squarely so holding.

*Id.*

Judge Hand explained that the pertinent question in cases in which inconsistent verdicts of guilty and not guilty are returned is whether, with respect to the guilty verdict, the jury was truly persuaded of the defendant's guilt. Because the acquittal on one charge may well have been based upon a desire to guarantee lenity or upon a compromise to achieve unanimity, the not guilty verdicts do not cast sufficient doubt upon the jury's return of the guilty verdict to justify overturning it on mere speculation.

> The most that can be said in such cases is that the verdict shows that *either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.*

That the conviction may have been the result of some compromise is, of course, possible; but *to consider so is to consider too curiously, unless all verdicts are to be upset on speculation. That it represented their deliberate judgment seems to us beyond any reasonable doubt.*

*Id.* (emphasis supplied).

If Judge Hand's decision in *Steckler v. United States* paved the way, it was Justice Holmes's opinion for the Supreme Court in *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932), that gave the principle the prominence that it has enjoyed for the last 75 years. A jury had convicted Dunn of maintaining a common nuisance by keeping intoxicating liquor for sale at a specified place. The same jury, however, had acquitted Dunn of both 1) the unlawful possession of the intoxicating liquor and 2) the unlawful sale of said liquor. Dunn contended that the conviction could not stand in light of the inconsistent acquittals.

The defendant says that the evidence did not warrant a conviction and that the verdict on the second and third counts is inconsistent with that upon the first and that for this reason also he is entitled to be discharged. The evidence was the same for all the counts.

*Id.* at 392, 52 S.Ct. 189.

Justice Holmes's opinion was brief but certain:

*Consistency in the verdict is not necessary.* Each count in an indictment is regarded as if it was a separate indictment. If separate indictments had been presented against the defendant for possession and for maintenance of a nuisance, and had been separately tried, the same evidence being offered in support of each, an acquittal on one could not be pleaded as res judicata of the other. *Where the offenses are separately charged in the counts of a single indictment the same rule must hold.*

*Id.* at 393, 52 S.Ct. 189 (emphasis supplied). After quoting with approval from Judge Hand's opinion in *Steckler v. United States,* Justice Holmes concluded:

<... >

That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible, But *verdicts cannot be upset by speculation or inquiry into such matters.*

*Id.* at 394, 52 S.Ct. 189 (emphasis supplied).

Lest any suspect that *Dunn v. United States* is now somehow superannuated, the 1984 opinion of a unanimous Supreme Court in *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), was a rousing reindorsement. In terms of *Dunn*'s continuing vitality, Chief Justice Rehnquist's opinion for the Court noted:

> *Fifty-three years later most of what Justice Holmes so succinctly stated retains its force.* Indeed, although not expressly reaffirming *Dunn this Court has on numerous occasions alluded to its rule as an established principle.* [The Court then cited and briefly discussed *United States v. Dotterweich,* 320 U.S. 277, 279, 64 S.Ct. 134, 88 L.Ed. 48 (1943), and *Harris v. Rivera,* 454 U.S. 339, 346, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981).]
>
> These decisions indicate that *this is not a case where a once-established principle has gradually been eroded* by subsequent opinions of this Court.

*Id.* at 63, 105 S.Ct. 471 (emphasis supplied).

A jury convicted Betty Lou Powell of a compound felony but inconsistently acquitted her of the predicate felony on which the compound felony was necessarily based. For situations such as these, Powell's complaint was familiar.

> She contended that proof that she had conspired to possess cocaine with intent to distribute, or had so possessed cocaine, was an element of each of the telephone facilitation counts; since she had been acquitted of these offenses in Counts 1 and 9, respondent argued that the telephone facilitation convictions were not consistent with those acquittals.

*Id.* at 60, 105 S.Ct. 471. The United States Court of Appeals for the Ninth Circuit agreed with Powell and reversed her

conviction on the compound felony. 708 F.2d 455 (1983), and 719 F.2d 1480 (1983) (following reargument).

In reversing, the Supreme Court pinpointed a critical flaw in the Ninth Circuit's rationale (and a critical flaw in the rationale invariably advanced in such cases):

> *The Court of Appeals explained* that an acquittal on the predicate felony necessarily indicated that *there was insufficient evidence to support the* telephone facilitation *conviction,* and mandated acquittal on that count as well.

469 U.S. at 61, 105 S.Ct. 471 (emphasis supplied).

Justice Rehnquist's opinion, however, pointed out that such an argument is based on the erroneous assumption that the acquittal was "proper" and that it, therefore, was the verdict that reflected what the jury "really meant."

> *[R]espondent's argument* that an acquittal on a predicate offense necessitates a finding of insufficient evidence on a compound felony count simply *misunderstands the nature of the inconsistent verdict problem.* Whether presented as an insufficient evidence argument, or as an argument that the acquittal on the predicate offense should collaterally estop the Government on the compound offense, *the argument necessarily assumes that the acquittal on the predicate offense was proper—the one the jury "really meant." This,* of course, *is not necessarily correct;* all we know is that the verdicts are inconsistent. *The Government could just as easily*—and erroneously—*argue that since the jury convicted on the compound offense the evidence on the predicate offense must have been sufficient.*

*Id.* at 68, 105 S.Ct. 471 (emphasis supplied).

To the extent to which there is a fear that the jury could not rationally have arrived at its guilty verdict, the Supreme Court made it clear that there is already in place a more direct and a fully adequate safeguard in that respect. No redundant attack on the jury's rationality will be brooked.

> *[A] criminal defendant already is afforded protection against jury irrationality* or error *by the independent review of the sufficiency of the evidence* undertaken by the

trial and appellate courts. *This review should not be confused with the problems caused by inconsistent verdicts.* Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt. *This review should be independent of the jury's determination that evidence on another count was insufficient.* The Government must convince the jury with its proof, and must also satisfy the courts that given this proof the jury could rationally have reached a verdict of guilt beyond a reasonable doubt. *We do not believe that further safeguards against jury irrationality are necessary.*

*Id.* at 67, 105 S.Ct. 471 (emphasis supplied). See also *Hudson v. State*, 152 Md.App. 488, 514, 832 A.2d 834 (2003).

In cooling the sometimes overheated defense ardor in cases of jury inconsistency, the Supreme Court helped us to look at the issue with a more neutral perspective. If logical integrity *per se* is, indeed, the controlling criterion, it is far more likely that it is the prosecutor who should be aggrieved by an illogical acquittal rather than the defendant who should be aggrieved by an illogical conviction. The asymmetry of our judicial review, however, precludes the prosecutor from seeking to have the illogical acquittal vacated and a more logical conviction arbitrarily installed in its stead.

As the *Dunn* Court noted, where truly inconsistent verdicts have been reached, "[t]he most that can be said ... is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." *The rule that the defendant may not upset such a verdict embodies a prudent acknowledgment of a number of factors.* First, as the above quote suggests, inconsistent verdicts—even *verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through*

*mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense. But in such situations the Government has no recourse if it wishes to correct the jury's error;* the Government is precluded from appealing or otherwise upsetting such an acquittal by the Constitution's Double Jeopardy Clause.

*Id.* at 64–65, 105 S.Ct. 471 (emphasis supplied).

Justice Rehnquist further pointed out that in cases of inconsistent verdicts, there is always a very real question as to "whose ox has been gored," and that the asymmetrical nature of the relief available is one of the many factors militating against appellate review.

Inconsistent verdicts therefore present a situation where *"error,"* in the sense that the jury has not followed the court's instructions, *most certainly has occurred, but it is unclear whose ox has been gored.* Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course. . . . For us, *the possibility that the inconsistent verdicts may favor the criminal defendant as well as the Government militates against review of such convictions at the defendant's behest.*

*Id.* at 65, 105 S.Ct. 471 (emphasis supplied). See *Hudson v. State,* 152 Md.App. at 515, 832 A.2d 834.

In cases involving an apparent inconsistency between a conviction of one charge and an acquittal on a related charge, the problem for appellate reviewers is always that of explaining the acquittal. Could it have been for some reason other than a lack of certainty as to the defendant's guilt? If it could have, there would be no reason to believe that the jury had not meant what it said when it returned the conviction. In *Hudson v. State,* 152 Md.App. 488, 515, 832 A.2d 834 (2003), Judge Thieme cautioned against "confus[ing] a curious verdict with an inconsistent verdict." The Supreme Court reiterated that a likely explanation of many "curious" acquittals is lenity on the part of the jury.

> *Dunn has been explained* by both courts and commentators *as a recognition of the jury's historic function,* in criminal trials, *as a check against arbitrary or oppressive exercises of power* by the Executive Branch.
>
> . . . *The fact that the inconsistency may be the result of lenity,* coupled with the Government's inability to invoke review, *suggests that inconsistent verdicts should not be reviewable.*

469 U.S. at 65–66, 105 S.Ct. 471 (emphasis supplied).

The Supreme Court concluded that if a defendant wishes to enjoy the benefit of an inconsistent acquittal, he must also be willing to accept the burden of an inconsistent conviction. The logic cuts both ways.

> [T]here is no reason to vacate respondent's conviction merely because the verdicts cannot rationally be reconciled. *Respondent is given the benefit of her acquittal on the counts on which she was acquitted,* and *it is neither irrational nor illogical to require her to accept the burden of conviction on the counts on which the jury convicted.* The rule established in *Dunn v. United States* has stood without exception in this Court for 53 years.

*Id.* at 69, 105 S.Ct. 471 (emphasis supplied). In short, *United States v. Powell* confirms that *Dunn v. United States* is still in vigorous good health.

From the first time that it addressed the question of an inconsistency between a jury conviction and a jury acquittal, Maryland has consistently endorsed the rule of *Dunn v. United States.* In *Leet v. State,* 203 Md. 285, 100 A.2d 789 (1953), Chief Judge Sobeloff quoted with approval from both *Dunn* and *Steckler v. United States.* The conclusion of the Court of Appeals was brief but sure.

> If we nevertheless assume that there was an inconsistency, the result is not necessarily to reverse the conviction. While it is true that a finding of guilt on two inconsistent counts will be declared invalid in Maryland, *it does not*

*follow that a conviction on one count may not stand because of an inconsistent acquittal on another count.* 203 Md. at 293, 100 A.2d 789 (emphasis supplied).

The Court of Appeals, again speaking through Chief Judge Sobeloff, reaffirmed that decision within the year in *Williams v. State,* 204 Md. 55, 64, 102 A.2d 714 (1954).

> Moreover, even if the two findings were inconsistent, acquittal on the disorderly conduct charge does not necessarily result in the conclusion urged upon us by appellants, that the assault charges must fail. A similar argument was rejected by this Court at this term, in *Leet v. State.* There, it was held that *a conviction on one count may stand even in the face of an inconsistent acquittal on another count.* Each count of an indictment is regarded as if it were a separate indictment, and *the inquiry is whether the evidence is sufficient to support the conviction* on that count *without regard to the disposition of other counts.*

(Emphasis supplied). See also *Ledbetter v. State,* 224 Md. 271, 273–74, 167 A.2d 596 (1961).

It was the opinion of Judge Digges in *Ford v. State,* 274 Md. 546, 337 A.2d 81 (1975), that laid to rest Emerson's "hobgoblin" of foolish consistency, as it found no reversible error in a jury's simultaneous verdicts of 1) conviction for using a handgun in the commission of a felony and 2) acquittal of the underlying felonies. The opinion, 274 Md. at 552–53, 337 A.2d 81, not only followed *Leet v. State, Williams v. State,* and *Ledbetter v. State,* but quoted liberally from *Dunn v. United States.*

Although *Hudson v. State,* 152 Md.App. 488, 832 A.2d 834 (2003), provided a good discussion of the law on inconsistent verdicts, it ultimately concluded that, as in the case now before us, there was no actual inconsistency between a jury's convicting the defendant of conspiracy to murder and its acquitting him of first-degree murder, albeit convicting him of second-degree murder.

> [T]here is no inconsistency either between the acquittal on the first degree premeditated murder count and the convic-

tion for conspiring to commit first degree murder or, obversely, an acquittal on a conspiracy charge and the conviction of first degree murder. These offenses are separate and distinct.

*Id.* at 515, 832 A.2d 834.

In its preceding discussion of jury inconsistency law, Judge Thieme reaffirmed the consistent Maryland position.

Consistency has never been a requisite attribute of a jury verdict. Continuing the common law tradition, "[i]nconsistent verdicts in a jury trial [ ] are generally tolerated under Maryland law."

*Id.* at 513, 832 A.2d 834. The opinion also reaffirmed some of the underlying policy considerations articulated by *United States v. Powell.*

[T]o reverse an inconsistent conviction would not only require guesswork about what produced the inconsistency, but *would* also *be unfair to the State, which cannot appeal an inconsistent acquittal.*

*Id.* (emphasis supplied). See also *Price v. State,* 172 Md.App. 363, 388–90, 915 A.2d 432 (2007).

It is within this subdivision of the larger field of inconsistent verdict law, a conviction by a jury inconsistent with a jury acquittal on a related charge, that we are dealing in the present case, even assuming, *arguendo,* such an inconsistency to exist.

## D. Peripheral Procedural Questions in Inconsistent Verdict Cases

*Mack v. State,* 300 Md. 583, 479 A.2d 1344 (1984), dealt coincidentally with inconsistent jury verdicts, but it is, in its most fundamental nature, a jury instruction case. A jury found Mack guilty of using a handgun in the commission o f a crime of violence even though it inconsistently acquitted him of the underlying crime of violence. The *Mack* opinion did modify the general law concerning jury instructions in one slight regard, but it basically simply followed the general law governing jury instructions. Judge Davidson first recited the

basic principle that a requested instruction that correctly states the applicable law must be given.

This Court has consistently held that the requirements of ... now Md. Rule 4–325(c) are mandatory and that under that Rule *a trial judge must give a requested instruction that correctly states the applicable law* and that has not been fairly covered in instructions actually given. Indeed, the failure to give such an instruction constitutes error.

*Id.* at 592, 479 A.2d 1344 (emphasis supplied). Mack had requested the following instruction:

[I]f the defendant is found [not] guilty of assault with intent to murder or maim, then he cannot be found guilty of the use of a handgun in the commission of a violent crime.

The Court of Appeals concluded that the requested instruction was, indeed, a correct statement of the law.

*[T]he instruction requested* in the instant case, which in essence would have explained that a verdict of guilty of a crime of violence is a prerequisite to a verdict of guilty of use of a handgun in the commission of such a crime, *constituted a correct statement of law.*

*Id.* at 595, 479 A.2d 1344 (emphasis supplied).

The *Mack* Court then made the slight modification necessary to discourage inconsistency between verdicts. Ordinarily, a jury considers and reaches a verdict on each charge in a vacuum. To avoid inconsistency between verdicts, however, a jury must sometimes be directed to "think outside the box" of a single charge and to consider several charges in relationship to each other.

*Generally,* each count of an indictment is regarded as if it were a separate indictment and *the jury is required to determine whether to make a finding of guilt on each count "without regard to the disposition of other counts."* However, if this general rule is applied when there is a multicount indictment under which a verdict of guilty of a crime of violence is a prerequisite to a verdict of guilty of use of a handgun in the commission of such a crime, the jury may be misled and may render inconsistent verdicts—not guilty of

the crime of violence and guilty of use of a handgun in the commission of such a crime. Under such circumstances, although the verdict of guilty of use of a handgun would be contrary to law, it nonetheless could stand.

In order to avoid this deleterious result, *the possibility of inconsistent verdicts must be minimized. This goal can be accomplished by a modification of the general rule when there is a multicount indictment* that charges a crime of violence and use of a handgun in the commission of such a crime, as well as other crimes.

*Id.* (emphasis supplied).

Judge Davidson explained the type of instruction in this regard that, if requested, would be required.

*[W]ith respect to those counts other than the count charging use of a handgun, the jury should be required to determine guilt on each count without regard to the disposition of the other counts. With respect to the count charging use of a handgun, the jury should be required to consider the disposition of the counts charging crimes of violence.* Accordingly, when there is a multicount indictment that charges a crime of violence and use of a handgun in the commission of such a crime, as well as other crimes, *a requested instruction* explaining, in essence, that in order to find an accused guilty of use of a handgun in the commission of a crime of violence, there must be a finding that the accused was guilty of a crime of violence *is applicable within the meaning of Md. Rule 4–325(c) and should be given.*

... Accordingly, *the trial court was required to instruct the jury that the petitioner could not be found guilty of use of a handgun if found not guilty of either of the charged crimes of violence.*

*Id.* at 595–96, 479 A.2d 1344 (emphasis supplied).

The Court of Appeals reaffirmed that, although the jury must be given such an instruction, if it is requested, the jury is not bound to follow the instruction.

In our view, *an instruction directing the jury to render consistent verdicts is beneficial* because it minimizes the

possibility of inconsistent verdicts that result in a conviction contrary to law. *Such an instruction does not in any way impair the jury's function. Even after such an instruction* has been given, *the jury retains its power to err, either fortuitously or deliberately, and to compromise or exercise lenity. It, therefore, retains the power to be the final arbiter* in the determination of which, if any, of the crimes charged the accused is guilty.

*Id.* at 597, 479 A.2d 1344 (emphasis supplied).

The opinion then turned to the question of whether the instruction actually given "fairly covered" the subject with respect to which the instruction had been requested. 300 Md. at 598, 479 A.2d 1344. It concluded that the subject had been fairly covered.

Although we recognize that the instructions actually given could have been more explicit, we nonetheless conclude that the requested instruction was fairly covered. Accordingly, the trial court did not err.

*Id.* at 599, 479 A.2d 1344.

The *Mack* opinion also left no doubt that the normal rules, according to Maryland Rule 4–325(e), governing preservation of an objection to instructions or to non-instruction still abide. Every time that the opinion mentioned that an instruction to avoid inconsistency might be required, it meticulously (on ten separate occasions) appended the prerequisite requirement "if requested." To the extent to which our opinion in *Bates v. State,* 127 Md.App. 678, 736 A.2d 407 (1999), can be read to alter that preservation requirement, we disavow any such alteration. An appellate court may overlook non-preservation by choosing, in its discretion, to notice "plain error" pursuant to Rule 4–325(e), but it is never required to do so.

If *Mack v. State,* is on the procedural periphery of inconsistent verdict law, *Wright v. State,* 307 Md. 552, 515 A.2d 1157 (1986), is beyond its pale. Although intermittently appearing in discussions of inconsistent verdict law, it is a double jeopardy case, pure and simple. At the end of the State's case, Wright received a judgment of acquittal on an attempted

felony because the State's evidence was not legally sufficient to support a conviction. Notwithstanding that acquittal, Wright was at the end of the entire case convicted by a jury of felony-murder based on the perpetration of the attempted felony. The Court of Appeals struck down the felony-murder conviction on double jeopardy grounds. Wright, having successfully terminated his jeopardy on the lesser included offense at the close of the State's case, should not have been allowed to continue in what would have amounted to a second or subsequent jeopardy for the "same offense."

*Wright* did add as an afterthought, 307 Md. at 576, 515 A.2d 1157, that if the verdicts were looked upon as inconsistent, they would have constituted inconsistent verdicts by the court (in granting the judgment of acquittal and then in allowing the felony-murder charge even to go to the jury) rather than as inconsistent verdicts by a jury.

On the procedural periphery there but remains a correction of course that we need to make with respect to some of our language in *Bates v. State,* 127 Md.App. 678, 736 A.2d 407 (1999). In the *Bates* case there were two appellants (the case is sometimes referred to as *Bates and Beharry v. State)* and our only present concern is with the co-defendant, Beharry. A jury convicted Beharry of felony murder, but acquitted him of armed robbery and attempted armed robbery, the only possible predicates for the felony murder. The trial judge gave an erroneous and incomplete jury instruction on felony murder, neglecting to include in the definition a critical and indispensable element of the crime. The trial judge properly defined felony murder as a homicide committed in the course of the perpetration or attempted perpetration of certain statutorily listed felonies, including robbery. What the instruction failed to tell the jury was that to be guilty of felony murder, Beharry must have been perpetrating or attempting to perpetrate the particular felony in the course of which the murder occurred. Our opinion quite properly concluded in this regard:

> The court's instruction on felony murder suggested that Beharry could be found guilty if the victim was killed during

an attempted armed robbery by Bates *so long as Beharry participated with Bates in the commission of some unspecified crime. On this instruction, the jury could have found Beharry guilty of felony murder even if it believed that he did not participate in the attempted armed robbery.*

127 Md.App. at 696, 736 A.2d 407 (emphasis supplied).

If the jury instruction had properly defined the underlying felony or its attempt as a necessary element of the crime that must be proved, it would not have mattered what the jury did in disposing of separate charges. Whether the predicate felony was actually separately charged or not was immaterial. The problem was not one of verdict inconsistency. It was one of the trial court's not having spelled out the elements of felony murder. That flawed instruction was realistically the exclusive reason for reversing Beharry's felony murder conviction. Our conclusion in that regard would have been precisely the same whether Beharry had ever been charged with robbery and attempted robbery or not. Our conclusion would have been precisely the same if no other verdicts, consistent or inconsistent, had ever been returned in the case. Our concern was not with whether the jury behaved inconsistently in returning sets of related verdicts. Our concern was only with the possible effect of the incomplete definition of the crime on the felony murder conviction itself.

As much as we wanted to reverse the felony murder conviction because of that erroneous instruction, we had a frustrating problem. The issue had not been preserved for appellate review. Beharry never objected to the instructions that were given and never requested that any other instruction be given. Maryland Rule 4–325(e). Directly then, we could not do the thing we were nonetheless determined to do. The clear and direct path through our dilemma should have been to exercise our discretion under Rule 4–325(e) and to take notice of "plain error," an option available to us even though we were not, of course, compelled to exercise it. It was at that point that our opinion latched on to the coincidental presence in the case of inconsistent verdicts as a possible way to circumvent the preservation problem with respect to the jury instruction. In

seizing upon it, however, we took some liberties with the preservation requirement that we now disavow.

*Mack v. State* in 1984 had been an impeccable statement of the law on jury instructions generally, including instructions on verdict consistency in multi-charge cases specifically. We quoted *Mack's* observation that "an instruction directing the jury to render consistent verdicts is beneficial." 127 Md. App. at 693, 736 A.2d 407. Of course it is. All correct instructions are beneficial. *Mack,* however, had said nothing about exempting "beneficial" instructions from the preservation requirement. The basic principles about being entitled to proper instructions upon request and about the necessity of preserving an objection were precisely the same for jury instructions on verdict consistency as they were for jury instructions on any other subject. There was a single body of preservation law, not two. There was never in *Mack* the remotest suggestion to the contrary. There was never any reason why jury instructions on verdict consistency should not be governed by the same general principles that governed jury instructions on every other subject. After neglecting to avail ourselves of the "plain error" exemption from the preservation requirement, however, we, in effect, had to create a separate body of law to cover the preservation requirement with respect to jury instructions on the subject of verdict consistency. It is that departure from the normal preservation requirement that we now disavow.

In creating a special exemption from the standard preservation requirement for a challenge to a judge's failure to instruct a jury on verdict consistency even in the absence of a request, we inadvertently took what had been the law's generally indulgent attitude with respect to jury inconsistency and recast it in a much harsher light. From *Steckler* and *Dunn* right through to the present, the law has always exhibited an understanding of the various reasons why juries do what they do and has been essentially indulgent of verdict inconsistency at the hands of a jury. This spirit of philosophic indulgence was fully and articulately expressed in the unanimous Supreme Court opinion of *United States v. Powell* in 1984.

Earlier in this opinion, we quoted liberally from *United States v. Powell* to illustrate how the law looked on the problem. Jury inconsistency was deemed to be a venial fault, but hardly an outrage of justice.

Whereas inconsistent convictions presumptively, albeit rebuttably, constitute reversible error, an inconsistency between a jury's conviction and a jury's acquittal presumptively, albeit rebuttably, does **NOT** constitute reversible error. In the case of the latter inconsistency, however, our opinion in *Bates* seemed to reverse the direction of that underlying presumption. The general rule had been that inconsistent jury verdicts will routinely be tolerated. Our purported reformulation of the rule, however, 127 Md.App. at 694, 736 A.2d 407, was that inconsistent jury verdicts will **NOT** be tolerated except in the limited circumstance in which "a reviewing court would have to speculate as to the reason for the inconsistency." We hereby reaffirm our adherence to the general rule.

To find some authority for taking notice of an instructional error notwithstanding the failure of a defendant to preserve the issue, our opinion sought solace in the opinion of Judge Wilner for this Court in *Jenkins v. State,* 59 Md.App. 612, 477 A.2d 791 (1984). *Jenkins,* however, was a case involving inconsistent convictions ("an intent to maim, disfigure, or disable necessarily falls short of, and thus excludes, an intent to kill." 59 Md.App. at 618, 477 A.2d 791) and not one involving an inconsistency between a conviction and an acquittal. We have already commented extensively on the inherent danger of lifting a statement out of one distinct subdivision of inconsistent verdict law and attempting to transplant it into very different soil.

In *Jenkins,* to be sure, we chose to notice the trial judge's failure to give a consistency instruction notwithstanding the defendant's failure to have requested such an instruction. 59 Md.App. at 620, 477 A.2d 791. On three separate occasions, however, 59 Md.App. at 620, 621, and 622, 477 A.2d 791, we were very careful to rely on our discretionary prerogative, pursuant to either Rule 4–325(e) or Rule 8–131(a), to take

notice of "plain error" even in the absence of an objection. *Jenkins* did not establish new law exempting such an instruction in the first instance from the normal preservation requirement.

*Jenkins*, moreover, was decided in the very different context of inconsistent convictions. When *Jenkins* referred to "real prejudice," it cited *Bell v. State*, 220 Md. 75, 150 A.2d 908 (1959); *Hardesty v. State*, 223 Md. 559, 165 A.2d 761 (1960); and *Boone v. State*, 2 Md.App. 80, 233 A.2d 476 (1967), all cases involving an excessive sentence following inconsistent convictions. In the context of inconsistent verdict law, the term "real prejudice" had never referred to anything else. "Real prejudice" in that special context was a notion that looked beyond the inconsistent verdict itself to a necessary consequence of the verdict. "Real prejudice," as we reemployed the term to justify our result, was cut loose from the only moorings that had given it meaning.

When we made reference to the "real prejudice" of an excessive sentence in the *Jenkins* case, we did so only for the purpose of assigning that as our reason for "exercis[ing] our discretion under [Rule 4–325(e)]" to "take cognizance of the error." 59 Md.App. at 622, 477 A.2d 791. Even in a case of an excessive sentence, moreover, we were clear that our entitlement to overlook non-preservation was only by way of the discretionary and permissive prerogative of noticing "plain error."

> The "bottom line" of these decisions seems to be that, unless some real prejudice is shown, no relief will be granted. Implicit from that is that, *if such prejudice is demonstrated, relief* **MAY** *be granted.*

59 Md.App. at 621, 477 A.2d 791 (emphasis supplied). We never suggested in *Jenkins* that an instructional error must be noticed, as a matter of right, in the absence of preservation.

In conclusion, *Bates v. State* validly stands for the principle that a jury instruction that defines a crime but fails to list all of the required elements of the crime is erroneous. Implicitly, it stands for the further proposition that, even in the absence

of preservation, an appellate court, pursuant to Rule 4–325(e), may, though it need not, exercise its discretion by way of noticing such "plain error." To the extent to which it exempts inconsistent verdict cases from the standard preservation requirements, however, it is hereby expressly overruled.

### The Verdicts in this Case

■ Even if we were to assume, *arguendo*, that the verdicts in this case were actually inconsistent, it would avail the appellant nothing. The verdicts were rendered by a jury and the assumed inconsistency was between a conviction and an acquittal. Seventy-five years of caselaw have established that such an inconsistency, in and of itself, is not reviewable.

On the procedural periphery, we know of no law requiring a judge to reconfigure a verdict sheet so as to inhibit verdict inconsistency, and we are not inclined, even if we were so empowered, to make law in that regard.

■ Also on the procedural periphery, no instruction with respect to verdict consistency was ever requested by the appellant, and nothing in that regard has been preserved for appellate review. Even if we had been invited, pursuant to the "plain error" exemption, to overlook the preservation requirement, there is nothing in this case that would make us wish to do so. *Jeffries v. State*, 113 Md.App. 322, 325–26, 688 A.2d 16 (1997).

### Restraints on Cross–Examination

In the course of the defense cross-examination of Koree, defense counsel alerted Judge McKee to her projected next line of questioning.

MS DOLAN: I probably should clear my final question. The Defendant's wife is prepared to testify that *her daughter asked the State's Attorney what would happen if she withdrew the charges now.* ... I truly believe it goes to the truthfulness of what she is telling, and ... when I ask the question, I don't want it objected to.

. . . .

MS. DOLAN: *The next question I want to ask is; Did you ever tell the State's Attorney,* in the presence of anybody in this case, that—*or ask her what would happen if you changed your mind and didn't want this; didn't happen and had been misinterpreted.*

(Emphasis supplied).

Judge McKee ruled that Koree could be asked directly about the offense but could not be questioned about a conversation with the prosecuting attorney.

THE COURT: You can ask her whether it happened or not. *I will not permit you to ask her whether or not she had a conversation with the State's Attorney in which she asked a question, legal advice as to what would happen if she wanted to change her mind.*

(Emphasis supplied).

The appellant now contends that this restriction on his cross-examination of his accuser was reversible error. On such issues, the standard of appellate review is clear. Significant control over the conduct of a trial is exercised by the trial judge. Maryland Rule 5–611(a) provides:

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

On the borderline of relevance there are infinite possibilities, and no rule or statute can begin to anticipate them all. It is here that there occur those countless evidentiary incidents necessarily requiring an on-the-spot judgment call by the trial judge. Appellate courts have long been trained not to interfere with or to "second guess" such judgment calls, unless the trial judge has been guilty of a clear abuse of discretion. The discretion necessarily entrusted to the umpire on the field embraces, by definition, a range of rational decisions. Within that range a trial judge may freely rule in either direction without fear of being overturned. In *Merzbacher v. State,* 346

Md. 391, 413–14, 697 A.2d 432 (1997), Judge Karwacki described both the trial judge's discretionary range and the appellate court's appropriate deference:

> We have said on numerous occasions that *trial courts retain wide latitude in determining what evidence is material and relevant*, and to that end, may limit, in their discretion, the extent to which a witness may be cross-examined for the purpose of showing bias. . . . As *the decision to limit cross-examination ordinarily falls within the sound discretion of the trial court,* our sole function on appellate review is to determine whether the trial judge-imposed limitations upon cross-examination that inhibited the ability of the defendant to receive a fair trial. Consistent with that discretion, we note, that *the trial judge, and not this Court, is in the best position to determine whether the introduction of certain impeachment evidence would enmesh the trial in confusing or collateral issues.*

(Emphasis supplied).

In *Ebb v. State*, 341 Md. 578, 587, 671 A.2d 974 (1996), Judge Raker wrote to the same effect:

> This right [of cross-examination], however, is not unlimited. We have recognized that *"trial judges retain wide latitude* insofar as the Confrontation Clause is concerned *to impose reasonable limits on* such *cross-examination based on concerns about,* among other things, harassment, prejudice, confusion of the issues, the witness' safety, or *interrogation that is* repetitive or *only marginally relevant."*
>
> *Trial judges have considerable discretion in determining what evidence is relevant and material.* The general rule is that the extent to which a witness may be cross-examined for the purpose of showing bias rests with the sound discretion of the trial judge.

(Emphasis supplied). In *Pantazes v. State,* 376 Md. 661, 680, 831 A.2d 432 (2003), the Court of Appeals again noted that one of the reasons a trial judge might rely on in limiting cross-examination is that the subject of the cross-examination is "only marginally relevant."

This Court subscribed to the same standard of appellate review of a trial judge's judgment call. In *Stouffer v. State,* 118 Md.App. 590, 625, 703 A.2d 861 (1997), Judge Davis explained:

> We have held that the right to cross-examine a witness is not absolute; it may be restricted by the trial judge. *The allowance of questions on cross-examination and determination of their relevance are reserved for the sound discretion of the trial court.* ... The court, in engaging in the balancing test, shall "give wide latitude to the [cross-examination] for bias or prejudice but *not permitting the questioning 'to stray into collateral matters which would obscure the trial issues and lead to the fact[ ]finder's confusion."* Only upon a showing of prejudicial abuse of discretion will the trial court's decision be disturbed on appeal.

(Emphasis supplied).

We hold that Judge McKee did not abuse his discretion in restricting the cross-examination of Koree. In the first place, the subject being explored was of "only marginal relevance." The proposed inquiry, to be sure, may have shown some skittishness or hesitation on the part of Koree about testifying against her stepfather, but that would not necessarily have impeached her credibility. In sexual child abuse cases, the victim is frequently extremely reluctant to subject a close family member to the clutches of the criminal law, and that reluctance may have nothing to do with whether the charges are true or not.

In this case, there was no animosity between Koree and the appellant. She stated that in her judgment, he "never intended to hurt her." Neither Koree nor her mother ever took the case to the police. It got there only through the unsolicited agency of Khadijah Tribble. Koree's mother and her stepsister were lined up to testify for the appellant. Koree's hesitancy to testify against her stepfather, if that is what the cross-examination would have shown, would have been a very natu-

ral reaction on her part and would not have impeached the credibility of her trial testimony.

The credibility of Koree, moreover, was not a major issue in this case. As to the roughhousing incident, the appellant did not deny it. The appellant himself stated that Koree was "not lying." He freely acknowledge that he may have "touched" her, but denied any sexual purpose in doing so. His note of apology to Koree stated, "I am so sorry that the thing you said I did happened." The heart of the defense was not that a touching of Koree never occurred, but that, even if it did occur, it had no sexual significance. Koree's testimony did not gainsay that defense or contradict it in any way. This case simply did not turn on Koree's credibility.

Just as there was little, if anything, on the side of the balance scale for permitting the cross-examination, there was a legitimate consideration on the other side of the balance scale for not permitting it. In support of her objection, the assistant state's attorney argued to Judge McKee:

> [I]f she is permitted to do that and if her mother is permitted to talk about a conversation she had with me, that is making me a witness to these proceedings, which means the Court would have to declare a mistrial, and we would have to have another State's Attorney assigned about what did or did not happen in this conversation. I'm just putting that out there because I don't think it's appropriate for her to talk about, her mother, a conversation she heard one side of.

(Emphasis supplied).

With only minimal reasons for permitting the cross-examination and with a significant reason being advanced for not permitting it, ruling as he did was quite obviously within the discretionary range of Judge McKee. He did not abuse his discretion.

On the contention that the cross-examination of Koree was unduly restricted, the appellant has added a second instance of alleged abuse of discretion. During the defense examination of Koree, the following occurred.

Q. Do you have a job?

A. Yes.

Q. Where do you work?

A. McDonald's.

Q. Okay. *Did you ever tell anybody* associated with this case *that you didn't go to work one day because someone carjacked you?*

MS. ANDERSON–SCOTT: Objection.

THE COURT: Sustained.

(Emphasis supplied).

Quite aside from the fact that Koree's credibility was not that critical an issue in the case, as we have already discussed, the question that was not permitted was so far afield and tangential that it did not even approach the outer limits of relevance. It was collateral in the extreme. As *Ebb v. State*, 341 Md. at 588, 671 A.2d 974, pointed out:

The judge must balance the probative value of the proposed evidence against ... the possibility of undue delay or confusion of the issues.

It was precisely the sort of collateral matter referred to by *Pantazes v. State*, 376 Md. at 681, 831 A.2d 432.

*The scope of cross-examination lies within the sound discretion of the trial court.* This discretion is exercised by balancing "the probative value of an inquiry against the unfair prejudice that might inure to the witness. *Otherwise, the inquiry can reduce itself to a discussion of collateral matters which will obscure the issue and lead to the fact finder's confusion."*

(Emphasis supplied).

Once again, Judge McKee's ruling was not an abuse of discretion.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**