47 A.3d 590

**Karl Marshall WALKER, Jr.**

v.

**STATE of Maryland.**

**No. 2733, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

June 28, 2012.

14

16

Brian L. Zavin (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Brenda Gruss (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: MATRICCIANI, GRAEFF, HOTTEN, JJ.

HOTTEN, J.

Appellant, Karl Marshall Walker, Jr., was indicted in the Circuit Court for Howard County for sexual abuse of a minor and attempted sexual abuse of a minor. On September 10, 2010, the circuit court denied appellant's motion to suppress evidence seized from the desk he used while employed as an assistant to the special education teachers at an elementary school. Following a two day bench trial on September 21 and 22, 2010, the circuit court convicted appellant of both charges and imposed a sentence of thirteen years, with all but seven years suspended and five years of supervised probation. Appellant timely appealed, presenting the following questions:

1. Was the evidence sufficient to convict Appellant of sexual abuse of a minor where the State showed only that

he exchanged inappropriate letters of a non-sexual nature with the alleged victim?

2. Did the court err in denying Appellant's motion to suppress evidence seized during a warrantless search of his desk at his place of employment?

For the reasons that follow, we affirm the judgments of the circuit court.

## I. MOTION TO SUPPRESS

### A. Factual Background

At the hearing concerning appellant's motion to suppress, Mr. M.,[1] the principal of the elementary school where appellant was employed, testified that appellant served as a "paraeducator," which is an assistant to the special education teachers, during the 2009–2010 school year. He stated that on March 17, 2010, a teacher gave him letters written by appellant that were found in the desk of either C.B. or her twin sister, third-grade students who shared a homeroom. Mr. M. testified that he called appellant that evening and left a voicemail message. When appellant returned Mr. M.'s call the following morning, Mr. M. advised that there was an investigation involving inappropriate communications between appellant and a student and that appellant should remain away from the school until further notice. Mr. M. also contacted other administrators, the head of his school's security, and the police.

He stated that Detective First Class Erika Heavner and another officer arrived at the school on March 18, 2010. The officers asked Mr. M. about appellant and requested that Mr. M. provide consent to search the desk used by appellant. Mr. M. executed a consent form and led the officers to the desk. The officers opened the drawers and examined the contents as Mr. M. stood nearby.

---

1. We have abbreviated many witnesses' names to their initials in an effort not to disclose their identities or the school and class in which appellant interacted with the victim.

At the hearing, Mr. M. described appellant's desk, which was owned by the school system, as being located in the "first grade pod," an area surrounded by three first grade classrooms, a technology classroom, and an alternative education classroom. This common area also contained two other desks used by two other paraeducators. According to Mr. M., appellant did not share his desk with anyone and, as a returning faculty member, could retain the same desk from year to year. Appellant's desk could have been locked, but appellant had not requested a key to lock the desk. Mr. M. also indicated that lockers were available for paraeducators to store their personal belongings, but, to his knowledge, appellant had not requested one. Because appellant's desk was located in a common area between classrooms, Mr. M. observed that there was a good deal of student traffic passing by appellant's desk between classrooms and that small groups and after-school programs used the common area. He went on to state that the groups using the common area would not need to access appellant's desk unless "to borrow a pencil or something like that."

Lastly, Mr. M. testified that appellant's employment was terminated soon after March 18, 2010. Mr. M. collected some of appellant's belongings from the desk, storing them in a bin in his office bathroom. Appellant never returned to the school to collect these items, but Mr. M. was uncertain whether appellant was allowed to enter the school.

Next, Detective Heavner, who was assigned to the Sexual Assault and Child Abuse Section of the Criminal Investigations Division, Family Crimes Unit of the Howard County Police Department, testified regarding her investigation on March 18, 2010. She indicated that she received Mr. M.'s permission to search the desk. Detective Heavner described the desk as having a vertical column of three drawers labeled "seminars, research data," "student data," and "learning" and a flat drawer in the center of the desk in front of the chair labeled "utensils." In the drawers, she found greeting cards and assignments from various students, a printed excerpt of a book entitled "Laughter: A Scientific Investigation," a blank

"Paraeducator/Paraprofessional Voluntary Transfer Request Form," a drawing of a bear, and a small cardboard box. The box contained a number of folded pieces of paper. She stated that the first piece of paper was addressed to "Raven K," a nickname for appellant, from "Steeler girl," a nickname for C.B. Detective Heavner stated that once she saw the first paper on top, she placed all the papers back into the box and seized the box. On March 26, 2010, eight days later, Detective Heavner applied for and executed a search warrant for the box and its contents. The box contained a multitude of notes and cards that appeared to be from C.B. to appellant.

Following the receipt of testimony and argument, the circuit court denied appellant's motion to suppress, finding that appellant did not have a reasonable expectation of privacy in the contents of the desk. The circuit court ruled as follows:

I make my decisions based on the evidence that's in front of me, this desk was, in fact, assigned to Mr. Walker, that's without dispute. This desk was capable—he was invited by the school to lock it if he wished, that's indisputable. This desk, and I'm looking at State's [Exhibit] J, the photograph of the front of the desk, has a key lock on the drawer underneath where the seat—or right above the seat, the mid-drawer, it has a key lock. There's no evidence that it's not capable of locking. This desk is in an open area where people have ample access to it. Given the nature of the use of the area it's a type of place where you could reasonably expect people to sit down and use the surface when Mr. Walker wasn't there. Because of the nature of the uses that the school system put it to there weren't specific work sites, that I could see in photograph G, that would accommodate these interventions,[2] so it's reasonable to think that this desk or any other desk could be used by other persons during these interventions or other uses of this open space and general space. This desk was not locked, it's clear to me it was not locked.

---

2. Mr. M. indicated that the "first grade pod" was also used for "small group interventions" for students with special needs.

And what's of importance to me is the labels on the drawers. Just because a person is permitted exclusive use doesn't mean the person has to agree to permissive use. And look to the facts individually in each case to determine whether or not there's been demonstrated a subjective expectation that his or her property or possessions will not be searched and whether or not that is an objectively reasonable expectation of the circumstances.

All I know is that this was assigned to Mr. Walker, that it could have been locked but it was not, that's in an open use area. And these labels are very important to me, the labels are as follows; on the general drawer it's labeled utensil and desk items, then are three other drawers, they're a tower—they're stacked one on top of each other type drawers on the right side of the desk, the top drawer is labeled seminars and research data, the middle drawer is labeled student data, the middle drawer [3] is labeled materials, learning. Now, if this was Mr. Walker's personal space that he had a reasonable expectation of privacy in then he certainly would not have any need to label the drawers, because he would know what was in the drawers. But, more importantly, the labels on the drawers are for items that cry out for collegial use, for use by other adults involved in the education of the children. There's no reason to label these things unless the teacher, perhaps, he's assisting needs to know how to get to student data based on one of the students in Mr. Walker's absence. There's no need to put utensils on a drawer except to direct anybody who needs a fork or something where to look. These labels say to anybody who walks by, these drawers contain items that are generally used in the business of bettering our children.

And I think that under the circumstances it has not been demonstrated that there was a reasonable expectation of privacy. So, therefore the police action conduct in this case

---

3. The circuit court likely was referring to the bottom drawer.

is not impermissible and I'll deny the motion for that reason.

## B. Discussion

 Appellant contends that the circuit court erred in denying his motion to suppress the evidence seized during the warrantless search of the desk. According to appellant, the court's findings that (1) the desk was located in a common area rather than a private office; (2) the desk was not locked when the police searched it; and (3) the desk drawers had general, non-personal labels were insufficient to support a finding of no reasonable expectation of privacy. The State counters that the circuit court correctly found that appellant did not have a reasonable expectation of privacy in the desk because its location suggested that other people would use it, it was not locked, and the labels on the drawers suggested it was for "collegial use." Additionally, the State avers that even if appellant had a reasonable expectation of privacy in the desk, the principal's consent rendered the search valid either under reasonableness or through apparent authority to consent.

 When reviewing a trial court's decision on a motion to suppress, "we view the evidence adduced at the suppression hearing, and the inferences fairly deducible therefrom, in the light most favorable to the party that prevailed on the motion." *Williamson v. State*, 413 Md. 521, 531–32, 993 A.2d 626 (2010) (citing *Bailey v. State*, 412 Md. 349, 362, 987 A.2d 72 (2010); *Crosby v. State*, 408 Md. 490, 504, 970 A.2d 894 (2009); *Longshore v. State*, 399 Md. 486, 498, 924 A.2d 1129 (2007); *State v. Nieves*, 383 Md. 573, 581, 861 A.2d 62 (2004); *Laney v. State*, 379 Md. 522, 533, 842 A.2d 773 (2004)). We will defer to a court's fact-finding unless those findings are clearly erroneous. *Williamson*, 413 Md. at 531, 993 A.2d 626; *Bailey*, 412 Md. at 362, 987 A.2d 72; *Crosby*, 408 Md. at 504–05, 970 A.2d 894. Still, "we review the ultimate question of constitutionality *de novo* and must 'make our own independent constitutional appraisal by reviewing the law and applying it to the facts of

the case.'" *Williamson,* 413 Md. at 532, 993 A.2d 626 (quoting *Bailey,* 412 Md. at 362, 987 A.2d 72).

The Fourth Amendment to the United States Constitution, which is applicable to the States by the Fourteenth Amendment, guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." *See Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Williamson,* 413 Md. at 534, 993 A.2d 626. A defendant who alleges that his or her Fourth Amendment rights have been violated "bears the burden of demonstrating his or her legitimate expectation of privacy in the place searched or items seized." *Williamson,* 413 Md. at 534, 993 A.2d 626 (citing *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)). The challenger must establish (1) a subjective expectation that his or her property will not be searched and (2) that the expectation is objectively reasonable under the circumstances. *Laney,* 379 Md. at 545, 842 A.2d 773; *accord Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). "A defendant demonstrates a subjective expectation of privacy by showing that he or she sought 'to preserve something as private.'" *McFarlin v. State,* 409 Md. 391, 404, 975 A.2d 862 (2009) (quoting *Smith,* 442 U.S. at 740, 99 S.Ct. 2577). Furthermore, "[t]o establish that the subjective expectation of privacy was objectively reasonable, a defendant must demonstrate that the law is prepared to recognize the expectation as 'legitimate.'" *Id.* (citing *Rakas v. Illinois,* 439 U.S. 128, 148, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (noting that an objectively reasonable expectation of privacy is "more than a subjective expectation of not being discovered")). Finally, "whether a[ ] [public sector] employee has a reasonable expectation of privacy must be addressed on a case-by-case basis." *O'Connor v. Ortega,* 480 U.S. 709, 718, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987).

The Supreme Court has recognized that an employee may have a reasonable expectation of privacy in his or her workplace. *Id.* at 716, 107 S.Ct. 1492 (citing *Mancusi v.*

*DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968)). "As with the expectation of privacy in one's home, such an expectation in one's place of work is 'based upon societal expectations that have deep roots in the history of the [Fourth] Amendment.' " *Id.* (quoting *Oliver v. United States,* 466 U.S. 170, 178 n. 8, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)).

Appellant directs our attention to *Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), and *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). In *Mancusi,*[4] 392 U.S. at 368, 88 S.Ct. 2120 state officials, without the benefit of a warrant, seized documents from DeForte's desk, which was located in "one large room, which DeForte shared with several other union officials." The Court held that DeForte had standing to challenge the admission of the documents at trial based on his Fourth Amendment rights for the following reasons:

> Since the Court in *Jones v. United States,*[5] [362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) ], explicitly did away with the requirement that to establish standing one must show legal possession or ownership of the searched premises, *see* 362 U.S. at 265–267 [80 S.Ct. 725], it seems clear that if DeForte had occupied a "private" office in the union head-quarters, and union records had been seized from a desk or a filing cabinet in that office, he would have had standing.

---

**4.** Mancusi was the warden of the prison holding DeForte after he had been convicted with the seized evidence. *Mancusi,* 392 U.S. at 366 n. 3, 88 S.Ct. 2120. The conviction was upheld on direct appeal. *Id.* at 365, 88 S.Ct. 2120. In the Supreme Court case, DeForte was challenging his conviction through a *habeas corpus* petition, alleging that the evidence had been unconstitutionally admitted. *Id.* at 366, 88 S.Ct. 2120.

**5.** The "automatic standing rule" of *Jones* has been overruled, and "defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated." *United States v. Salvucci,* 448 U.S. 83, 85, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). Nevertheless, we believe appellant may rely on the quoted language from *Mancusi* in his argument that he had a reasonable expectation of privacy in the desk. *See O'Connor,* 480 U.S. at 716–17, 107 S.Ct. 1492 (quoting *Mancusi,* 392 U.S. at 369, 88 S.Ct. 2120).

*Cf. Go–Bart Importing Co. v. United States,* 282 U.S. 344 [51 S.Ct. 153, 75 L.Ed. 374 (1931) ]; *Silverthorne Lumber Co. v. United States,* 251 U.S. 385 [40 S.Ct. 182, 64 L.Ed. 319 (1920) ]. In such a "private" office, DeForte would have been entitled to expect that he would not be disturbed except by personal or business invitees, and that records would not be taken except with his permission or that of his union superiors. It seems to us that the situation was not fundamentally changed because DeForte shared an office with other union officers. DeForte still could reasonably have expected that only those persons and their personal or business guests would enter the office, and that records would not be touched except with their permission or that of union higher-ups. This expectation was inevitably defeated by the entrance of state officials, their conduct of a general search, and their removal of records which were in De-Forte's custody. It is, of course, irrelevant that the Union or some of its officials might validly have consented to a search of the area where the records were kept, regardless of DeForte's wishes, for it is not claimed that any such consent was given, either expressly or by implication.

*Mancusi,* 392 U.S. at 369–70, 88 S.Ct. 2120. Therefore, the Supreme Court held that a union employee who shared an office with other union employees had a privacy interest in the office sufficient to challenge successfully the warrantless search of the office. *Id.* at 369, 88 S.Ct. 2120. Justice White dissented from the majority opinion in *Mancusi* and stated, "[a]lthough the Fourth Amendment perhaps protects the individual's private desk in a union office shared with other officers or employees, I dissent from the Court's extension of the protected area to the office door." *Id.* at 377, 88 S.Ct. 2120.

In *O'Connor, supra,* 480 U.S. at 711, 107 S.Ct. 1492 a physician filed a complaint under 42 U.S.C. § 1983 against officials at the state hospital where he worked, alleging that their search of his office violated his rights under the Fourth Amendment. Based on *Mancusi, supra,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154, and *Oliver, supra,* 466 U.S. 170,

104 S.Ct. 1735, 80 L.Ed.2d 214, the Court "reject[ed] the contention . . . that public employees can never have a reasonable expectation in their place of work[,]" holding that the "operational realities of the workplace, however, may make *some* employee's expectations of privacy unreasonable when an intrusion is by a supervisor rather than a law enforcement official." *O'Connor*, 480 U.S. at 717, 107 S.Ct. 1492. Furthermore, "[p]ublic employees' expectations of privacy in their offices, desks, and file cabinets, like similar expectations of employees in the private sector, may be reduced by virtue of actual office practices and procedures, or by legitimate regulation." *Id.* The physician did not share his desk or file cabinets with any other employees, had occupied the separate office for seventeen years and kept personal materials in his office, including personal correspondence, medical files, correspondence from patients unconnected to the hospital, personal financial records, teaching materials, and personal gifts. *Id.* at 718, 107 S.Ct. 1492. The Court also noted that there was no evidence that the hospital had any regulations or policies discouraging doctors from storing personal papers and effects in their desks or file cabinets, though "the absence of such a policy does not create an expectation of privacy where it would not otherwise exist." *Id.* at 719, 107 S.Ct. 1492. Accordingly, the Court held that there was undisputed evidence that the doctor had a reasonable expectation of privacy in his desk and file cabinets. *Id.* at 718, 107 S.Ct. 1492. Nevertheless, because the search at issue was conducted by a public employer rather than law enforcement, the Court applied a special needs reasonableness analysis, balancing the invasion of the employee's "legitimate expectations of privacy against the government's need for supervision, control, and the efficient operation of the workplace." *Id.* at 719–20, 107 S.Ct. 1492 (citing *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *Camara v. Municipal Court*, 387 U.S. 523, 536–37, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)).

Applying precedent to the case at bar yields the conclusion that appellant did not have a reasonable expectation of privacy in the desk. We recognize that appellant was assigned the

desk and that he had used the same desk in prior school years. Yet, the desk was owned by the school system and was located in a large, open, well-traversed room. This room was referred to as the "first grade pod," connecting several classrooms, and contained desks for two other paraeducators. Because it was so centrally located, students and faculty routinely passed the desk. Small instructional groups and after-school programs also held meetings and conducted other activities in the large room, which was only secured at night when the custodians locked the doors leading to the outer hallways.

Appellant could have taken steps to safeguard what he kept in the desk, but did not. The principal of appellant's school indicated that although other people at the school likely would not have reason to open the drawers of the desk, he stated that someone might look in the desk "to borrow a pencil or something like that." Furthermore, at the time of the search, the drawers read "seminars, research data," "student data," and "learning." Regardless of who originally placed them on the drawers, the labels suggested that the drawers contained school-related materials accessible to a wide range of persons, rather than appellant's personal, private items. *Cf. O'Connor*, 480 U.S. at 718, 107 S.Ct. 1492 (employee had a reasonable expectation of privacy in desk and file cabinet in own office not shared with anyone else in which he stored personal documents); *Gillard v. Schmidt*, 579 F.2d 825, 828 (1978) (guidance counselor who was responsible for maintaining confidential student records and whose desk was in an office secured by a locked door had a reasonable expectation of privacy in his desk). Appellant could have used a private locker provided to him by the school, but he did not. Appellant had the option of locking the desk, but he did not. The aforementioned facts, taken together, indicate that appellant did not have a subjective expectation of privacy, and even if he did, such an expectation was objectively unreasonable under the circumstances presented. Accordingly, we discern no error in the circuit court's denial of appellant's motion to suppress.

## II. SUFFICIENCY OF THE EVIDENCE PRESENT-ED AT TRIAL

### A. Factual Background

At the bench trial, Ms. P. and Ms. C., teachers at appellant's school, testified that on March 17, 2010, they found a letter in C.B.'s desk and gave it to Mr. M., because they found the contents inappropriate and disturbing. Appellant, who had assisted in C.B.'s class that year, wrote the letter under the nickname "Raven–K" to "Steelergirl." [6] The letter stated:

U won't see me after school 2day. I really miss u when we r away I can never get anytime wit u. U look so pretty n gorgeous 2day. Purple is my favorite color and u look so good in it. I had a dream that we went 2 Las Vegas on a plane. I was screaming loud and you said, "Stop being a bitch and man-up." I said, "O.K." I love when u r forceful and mad. We had fun holdin hands and hugging. We watched movies and went to a club to dance.

I loved the bear u made me. I hoped the MSA went well. U r so smart and beautiful. U r right. I care about u so much. My heart aches when I m away from u. If anyone ANYONE hurts u, I would fuckin kill them.

Know that my ♥ will always b-long 2 u. I do think about kissing u sometimes but I'd never do it if u didn't want 2. At

---

**6.** As a paraeducator, appellant assisted students with special needs who were included in classes with other non-disabled students. *See P. v. Newington Bd. of Educ.*, 546 F.3d 111, 119 (2d Cir.2008) ("The [Individuals with Disabilities Education Act, 20 U.S.C. § 1412(a)(5) ] mandates that '[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.' "). Teachers at C.B.'s school testified that paraeducators would often assist them with other classroom activities as well, involving the entire class. Therefore, even though C.B. was not a student with special needs, she was in a class with several students with special needs, so she and appellant often interacted in a classroom setting.

least I can kiss your picture every night. I know this is a little strong but it[']s how I feel about you.

I hope u miss me as much as I miss u when we r away. [I] [a]m n ♥ with U always.

C.B.'s teacher, Ms. P., testified regarding C.B.'s journal, in which C.B. wrote fictional stories as part of her school assignments. The journal was admitted into evidence, and Ms. P. stated that she had become concerned earlier in the school year when she read a story C.B. wrote detailing a camping trip with appellant. She brought the issue to the attention of the school psychologist because C.B. imagined going camping with an adult. The psychologist, however, found no issues with the journal entry because C.B. did not describe sharing a sleeping bag with an adult.

Both teachers, Ms. C. and Ms. P., described appellant as "friendly" and someone with whom students "were always willing to work." He would give students "high fives" in the hallways and acted more like a friend than a teacher. Ms. C. stated that several students, including C.B., would hug appellant when he entered the classroom, with C.B. usually initiating the hugs. Ms. C. stated that she also hugged students if the student initiated the hug, but that she would only hold a student's hand for behavioral purposes.

Moreover, Ms. P. testified that she had chastised appellant for giving a student a chocolate bar, which was unfair to other students and contrary to the county school policy, and that appellant was understanding and indicated that he had not realized it was improper. Ms. P. also articulated that appellant paid more attention to C.B., her sister, and another female student. She witnessed appellant discuss football with C.B. and her sister. She also saw appellant hug C.B., who appeared to have a crush on appellant, but she did not see appellant and C.B. holding hands. Ms. P. stated that she occasionally hugged students when they initiated, but that she did not hold students' hands, even for disciplinary purposes.

Mr. M. testified and reiterated much of his testimony from the suppression hearing. He elaborated that during the

course of appellant's employment at the school, he had conversations with appellant, especially during appellant's first year of employment, regarding appellant's "overly friendly approach." Specifically, Mr. M. stated that he counseled appellant about hugging students, to minimize the length of a hug, to "hug on the side," and to extend a hand for a handshake instead.

Next, Detective Heavner testified, restating much of her testimony from the suppression hearing. She stated that on March 18, 2010, before going to the school, she responded to a telephone call from C.B.'s mother, advising that she had recovered papers from C.B.'s backpack. Detective Heavner retrieved the papers, which the State introduced as evidence. The papers included the following:

- A heart-shaped piece of paper on which appellant wrote a letter to C.B., stating that he "missed [her] so much," that he "hate[s] the weekends" because he did not get to see her, expressed sadness that she lost a game, told her that she was "still a winner to [him]," said he "just want[s] to hold, hug, and be with [her]," and wished her well on the Maryland School Assessment.

- A letter from appellant to C.B., wishing her a "great weekend" and stating. "[h]ere is something sweet for the sweetest girl I now. Can I ask you to be my girl? I love having you in my life. I won't ask you for anything than to just be there for me. I need you in my life and can't live without you. Just be there for me. . . . M[y] ♥ B longs 2 U . . . ."

- A piece of paper on which Mr. Walker listed "[t]hings" he loved: God, music, family, life, fitness, exercise, the Ravens, football, baseball, basketball, jazz, piano, and "Steeler Girl." Appellant also wrote "I hope you don't think I'm weird, but I really do care about you."

- A letter from appellant in which he wrote that he "liked" C.B.'s "outfit" that day, told her that her name meant " 'Curly-hair' and 'cutey' " and that his name meant "strong free man," called C.B. his "very best friend," and

told her that her hug "made [his] day" and that his "heart races a 1,000 beats per minute" when they talk.

● A letter in which appellant wrote the following:

I really missed you over the weekend. The whole weekend I kept thinking about you. Wondering what you were doing.

Sorry for being in a funky mood 2day. I have to be honest with you. I am sad because I really love you and I know I'm not supposed to. I'm not some perverted child psycho stalker. I don't think perverted thoughts of you. I just have a deep love and care for you.

I keep trying to stop feeling this way about you, but I just can't. I have dreams every night of holding you, you sleeping in my arms. Having belching contests. Arguing over the Ravens and Steelers (they suck suck suck). Then you get real mad and starting beating me up. Then we apologize, hug, and hold hands.

When I see you I get so happy, then I get very sad. I can't hold your hand. We can never spend time together. Seeing you go home on the bus is the worst part of my day. I love giving you things because it's the only way I can show you how much I love you. I feel like I'm going crazy. I also heard you have a boyfriend. That has me very depressed.

Please don't think of me as some creep or monster. I don't want to lose your respect. I feel like Cullen in the Twilight stories and you are the girl.[7] I have tried to make myself not like you, but too late. I have fallen for you hard. Maybe I do need to go to another school.

Just know that I am totally in love with you and will never stop caring for you. I am sorry for feeling this way about you. Please don't think bad of me.... P.S. Tear this up after you read. Tear the other notes too.

---

**7.** "The Twilight stories" are a series of books, now adapted into movies, in which a teenage girl named Isabella "Bella" Swan falls in love with Edward Cullen, a 104–year–old vampire who appears to be a teenage boy.

- A letter from appellant, stating: "Your sister told me about you and Randy. You could have told me. I won't bother you anymore."
- A letter in which appellant apologized to C.B. for "picking [her] up too high" and told her about a dream as follows:
 We went to the movies to see Twilight Eclipse. You sat in my lap and put your arms around my neck and kissed me on my cheek. THEN FELL SLEEP! I tried to wake you but you snored LOUD in my face. So I kissed you 7 times on your for[e]head and once on your lips. You woke up and we watched the rest of the movie with you in my arms and your head on my chest.
- A letter in which appellant formed an acrostic from C.B.'s name to give her compliments, including that she was cute, sweet, and the "bomb," and called her his "soup R ★ 4 ev R."
- A letter in which appellant told C.B. that he "like[d] seeing [her] smile at [him] again," thanked her "for making [him] smile again," and told her that she was his "only love."
- Another letter in which appellant used C.B.'s name to give her compliments.
- Letters in which appellant wished C.B. well on the Maryland School Assessment.
- A letter in which appellant apologized for not coming to a Valentine's Day party and told C.B. that "[they] have to play basketball so that [he] can see if [he] can beat [her]."
- A heart-shaped piece of paper on which appellant wrote that he loved "C.B." and told her that "[o]nly [her] hugs can melt [his] heart" and that it "makes [his] day" when she holds his hand.
- A letter from appellant with the following poem for C.B.:
 When the weather outside is frightful.
 Being at home is so delightful.
 But it makes me miss you so.
 When school is closed because of the snow.
 YOU R SNOW BEAUTIFUL. :)

- A letter in which appellant listed the following "reasons [he] think[s] [C.B.] [is] wonderful and care[s] about [her] so much[:] 1. You are so beautiful. 2. You are a good person. 3. You have nice curly hair. 4. You are intelligent. 5. You like to crack jokes and have sense of humor. 6. Even when you are mad I think you are so pretty. 7. You like music. 8. You like being different."

- A letter from appellant, stating:

 Thank u 4 reading with me. It seems everytime [sic] I wanna spend time with u some 1 interrupts. I want to kick those kids [i]n their stupid heads. U looked so pretty 2day. [I] [a]m n ♥ with u so much. I wish we could spend more time 2gether. U r so much fun.

 Write 2 me when u get a chance. ♥ ed your bear u made 4 me. I hope your sister was not sad 2day. She is a good friend but you r my girl and my love. Never 4get that.

- A letter in which appellant wrote that he "miss[ed]" C.B., was "sad" when he was away, and congratulated C.B. on making honor roll.

- A letter in which appellant drew a heart with the words "Olive U" inside the heart.

- A note from appellant, stating "Emily asked me if I had six-pack abs, I said yes, but they are for one person to see. That's Steeler girl."

- Pictures of hearts containing the words "Mr. Steelergirl."

- A letter in which appellant used pictures to tell C.B. that she was talented, gifted, and perfect.

- Drawings of cartoon characters, including the Tasmanian Devil, Tweety Bird, Snoopy, Nemo, the Cat in the Hat, Daffy Duck, birds, and a shark.

Also during Detective Heavner's testimony, the State introduced into evidence the items found in the desk, which included:

- A blank "Paraeducator/Paraprofessional Voluntary Transfer Request Form."

- A piece of paper on which C.B. used the letters of appellant's name to give him compliments, including that he was "wonderful," "amazing," "kind," and "rad (cool)"
- Drawings of birds, a giraffe, a dinosaur, people, and a seahorse. Some of the drawings were signed by C.B. "With love" or "With all my love."
- A heart with the initials "CW" in it.
- A letter from C.B. in which she wrote to appellant: "I don't think your [sic] weird at all. When you give me things it makes me fell [sic] special. Thank—you that you care for me."
- A handwritten Valentine's Day card from C.B. to appellant.
- A drawing of a heart in which C.B. wrote the name "Raven K" and the words "awesome," "great," "nice," "cool," "good," "sweet," and "intelligent."
- A drawing of a bear in which C.B. wrote "[her elementary school] Rocks! Go Bears."
- A Christmas card to appellant from a student named Emily.
- Papers with pictures of a snowman, a turkey, a gingerbread man, and other things. One piece of paper from a student named Ciara stated "I like WOCR he is [nice] to me." Other papers contained stamps of bears holding hearts with "I love you" written on them.
- A chapter on "ticklish relationships" from a book entitled "Laughter: A Scientific Investigation." Various portions of the chapter are highlighted, including a statement that "[t]he response to tickle is an innate, socially and behaviorally complex reaction directed toward terminating the stimulus that triggered it" and discussions about the history of tickling, the role of tickling in some sexual fantasies, the reasons a person cannot tickle himself or herself, and whether any non-human animals are ticklish.[8]

---

8. On cross-examination, Detective Heavner stated that she also found articles entitled "Social Skills Training and Approaches" and "Sensory

On the same date as the search of the desk, Detective Heavner and Detective Brandy Kurty interviewed appellant, taping the interview. The State played the interview for the circuit court. Arriving wearing a Ravens jacket, appellant admitted during the interview that he gave C.B. letters and drawings beginning around Christmas of 2009. He maintained, however, that there was nothing in the letters "about touching [him] inappropriately or anything like that" and that he never attempted to contact C.B. outside of school. He explained:

> I care for her greatly. . . . I don't want to hurt anybody's kids. . . . And, I, that's not what I'm about, and I'm not about . . . child grooming. . . . [M]y intent is not to groom somebody's child with the purpose of committing any type of lewd act or anything like that, I just, it was just conversations going back and forth. . . . [N]othing romantic, no I, I wouldn't say it was romantic at all, it just, I just, I just really care for her because you know, she reminded me a lot of when I was a kid . . . and when I was around her age, um, she used to share with me a lot of issues that she had with anger and I used to share with her, well, I had a lot um, then, you know, any, you know, when, when you're writing back and forth, you know, it just sometimes, it just, you, you're going back and forth and you're going back and forth and you know, and I should have cut it off[.]

Appellant further stated that "it's not even a physical connection at all, it's not, I have no sexual fantasies about [C.B.] whatsoever, or anybody's children." [9] Appellant ended the interview by asking whether he could tell C.B.'s parents that he was sorry and stating that he was willing to transfer to a different school to help C.B. and her family.

Detective Heavner testified that she received additional papers from C.B.'s mother in the following month, including a

---

Modulation and Effective Disorders in . . . Children and Adolescents with Aspergers." These articles had not been highlighted and were not seized by the detectives.

9. Appellant was married with two young children of his own.

letter in which appellant told C.B. that she "can be honest with [him]" and "tell [him] anything" and stated that he would never "hurt [her]" and would "understand" if C.B. "want[ed] a boyfriend or like[d] someone." Detective Heavner also searched appellant's apartment pursuant to a warrant, but did not find any child pornography.

C.B.'s mother testified that she recalled an afternoon in December 2009 when C.B. got off the school bus in tears. She explained that C.B. was upset because appellant might be transferring to another school that school year or the next. She stated that C.B. was visibly upset the entire afternoon, which was a Friday, but that it was not "an issue by the time [C.B.] went back to school" the next Monday. C.B.'s mother stated that the school contacted her on March 17, 2010 regarding the letter in C.B.'s desk. She took C.B. and her twin sister to the Child Advocacy Center, where they met with detectives. She also searched C.B.'s backpack and room, finding the letters she gave to Detective Heavner. She elaborated that soon after finding the letters, C.B. was upset and displayed temper tantrums when they would discuss appellant. According to C.B.'s mother, C.B.'s behavior returned to normal "almost immediately," but there were two consecutive days in August 2010 when C.B. was upset because she had been thinking of appellant.

C.B. testified that she knew appellant as a "friend at school." She recalled exchanging letters with appellant in which they referred to each other as "Raven K" and "Steeler girl," but she could not remember when they began exchanging letters. She stated that she and appellant would hand each other letters at the end of the school day as she headed to her bus. They would hug each other, but only in the presence of other children, with whom appellant also regularly exchanged hugs and "high fives." Finally, C.B. testified that appellant held her hand and gave her money and candy.

At the close of the State's case, appellant entered stipulations into evidence that C.B.'s two brothers would have testified that they knew appellant from elementary school, that he

regularly gave candy to students, and that he was generally a fun and nice guy. Appellant moved for a judgment of acquittal on the grounds that appellant's actions, save for the letters to C.B., were not particular to C.B. because appellant gave hugs, candy, and "high fives" to other students and were not criminal under the Maryland sexual abuse statute and related case law. As to the attempted sexual abuse charge, appellant argued that the evidence did not demonstrate that he took a substantial step toward engaging in a sexual act with C.B.

The court denied the motion, but waited until it announced the verdict to state the reasoning. When it did announce the verdict, the court first stated that there was no dispute that appellant, as a paraeducator, was a person with temporary care or responsibility for C.B. Then, the court summarized the evidence and ruled as follows:

> Now as far as the crimes themselves that [appellant] is charged with, to date all of the Maryland cases that involve allegations or convictions for child sex abuse have involved physical acts that were sexual in nature. So this probably, at least from a reported opinion standpoint, I'm not sure about unreported, is the first case in which there wasn't actual physical contact that was sexual in nature.

> So although there was, as I indicated, testimony and stipulations that [appellant] hugged other students and gave other students money and candy, there is no evidence presented that any of these other students received the type of notes that [appellant] sent to [C.B.] or the inappropriate attention he showered upon her. So the *gravamen* of the offense of child sexual abuse isn't the act itself but [t]he abuse of the child. [Appellant] certainly was in a position of authority. He was able to gain [C.B.'s] trust and then he abused that trust.

> The notes he sent to her professed his love for her, his desire to spend time with her, share his dreams and fantasies including sleeping with her in his arms. He also told her he thought about kissing her but wouldn't do it if she didn't want him to. But certainly put that invitation out there for a future event.

At least two of the notes referred to the Twilight Trilogy and the Eclipse movie where [appellant] cast himself in the role of Cullen and [C.B.] in the role of Bella. And the movie itself was not, obviously, sought to be admitted into evidence and there wasn't a lot of testimony about the movie itself. But I think it's fairly common knowledge that this trilogy is geared toward teenagers and younger, clearly involving romance. Cullen is the vampire and Bella is the teenage girl who falls in love with him. So there wasn't any evidence presented with that. It doesn't form the basis of my ultimate decision in this case. But I just mention it for the fact that I believe that's fairly common knowledge.

Sexual acts are not only limited to physical acts. Taking all of the evidence into consideration I find that the totality of the letters, the hugging, the holding hands, were all evidence that [C.B.] was exploited and exploited within the meaning of the Child Sexual Abuse Statute.

These letters set the stage for future acts and were extremely suggesting in an inappropriate and sexual manner. Certainly not the types of letters a thirty eight year old man in his position should send to an eight year old girl. As I mentioned, he used these actions in order to gain her trust and then subsequently abused her trust.

The letters were, I know there's a suggestion that the letters were inappropriate and perhaps passionate but not sexual in nature. It's hard to read these letters, including the totality of these letters, and not find that they were sexual from the standpoint that the passionate comments they contained bordered, almost border on obsession, contained expressions of jealousy and certainly had sexual undertones.

Unfortunately, [appellant's] fantasies became an eight year old girl's reality. And this is evidenced by the effect that these letters and these actions had on [C.B.] as observed by her mother.

So I find that the letters, the hugs, hand holding and fantasies were all for [appellant's] benefit and he exploited [C.B.] for his benefit. He kept all of the notes that he

received which is further evidence that the exploitation was for his benefit. And in looking at the legislative intent of this statute, it's hard to imagine that the legislative intent would not include these actions as falling within the ambit of the Child Sexual Abuse Statute.

And like any interpretations of a statute, the case law is going to develop as the cases get presented in terms of interpreting that statute. But clearly the type of action here falls within the scope and the legislative intent to protect the emotional and psychological welfare of children.

So, as far as the actual verdict, I do find that the State proved beyond a reasonable doubt that [appellant] had temporary custody of [C.B.], that he took advantage of her and unjustly and improperly used her for his own benefit. And I find that he did exploit her within the meaning of the Child Sexual Abuse Statute. So I will find him guilty of Count One[,] [sexual abuse of a minor].

I will also find him guilty of Count Two, finding beyond a reasonable doubt in terms of the attempted sexual abuse of a minor, that he took substantial steps beyond mere preparation. So I find him guilty of both counts.

(Emphasis in original).

## B. Discussion

Pursuant to Maryland Rule 8–131(c) [10] and Maryland case law, the following standard of review applies in resolving appellant's claim of legal insufficiency:

We examine the record solely to determine whether "any rational trier of fact could have found the essential elements of the crime[ ] beyond a reasonable doubt." *Moye v. State,* 369 Md. 2, 12 [796 A.2d 821] (2002); *accord Jackson v. Virginia,* 443 U.S. 307, 319 [99 S.Ct. 2781, 61 L.Ed.2d 560]

---

10. Md. Rule 8–131(c) states:
 When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

(1979) ("[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction ... is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."); *see Hackley v. State,* 389 Md. 387, 389 [885 A.2d 816] (2005). In so doing, "[i]t is not our role to retry the case." *Smith v. State,* 415 Md. 174, 185 [999 A.2d 986] (2010). Rather, "[b]ecause the fact-finder possesses the unique opportunity to view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses during their live testimony, we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence." *Id., citing Tarray v. State,* 410 Md. 594, 608 [979 A.2d 729] (2009). We defer to any possible reasonable inferences the [trier of fact] could have drawn from the admitted evidence and need not decide whether the [trier of fact] could have drawn other inferences from the evidence, refused to draw inferences, or whether we would have drawn different inferences from the evidence. *State v. Smith,* 374 Md. 527, 557 [823 A.2d 664] (2003); *see also State v. Albrecht,* 336 Md. 475, 478 [649 A.2d 336] (1994) ("[I]t is not the function or duty of the appellate court to undertake a review of the record that would amount to, in essence, a retrial of the case.").

*State v. Mayers,* 417 Md. 449, 466, 10 A.3d 782 (2010) (parallel citations omitted). When the trier of fact is the trial court, as in this case, the finding of the trial court "will not be disturbed unless the trial judge's findings of fact are clearly erroneous." *In re Anthony W.,* 388 Md. 251, 261, 879 A.2d 717 (2005). Furthermore, " '[w]hen the trial court's order involves an interpretation and application of Maryland statutory and case law, [the appellate court] must determine whether the lower court's conclusions are legally correct under a *de novo* standard of review.' " *Stephens v. State,* 198 Md.App. 551, 558, 18 A.3d 168 (2011) (quoting *Gray v. State,* 388 Md. 366, 375, 879 A.2d 1064 (2005)). We have elaborated on this *de novo* review as follows:

[a]n assessment of the legal sufficiency of the evidence is not an evidentiary issue but a substantive issue, with respect to which an appellate court makes its own independent judgment, as a matter of law. This is an area wherein the reviewing court is not at all deferential to the trial court. It makes the same determination on the same basis as does the trial court. In assessing legal sufficiency, we will look only at that which was formally received in evidence.

*Polk v. State,* 183 Md.App. 299, 306, 961 A.2d 603 (2008).

 Appellant contends that the circuit court erroneously denied his motion for judgment of acquittal and convicted him of sexual abuse of a minor under Md.Code (2002), § 3-602 of the Criminal Law Article ("C.L.")[11] because the State only presented evidence that he exchanged inappropriate letters of a non-sexual nature with C.B. C.L. § 3-602 provides:

(a)(4)(i) "Sexual abuse" means an act that involves sexual molestation or exploitation of a minor, whether physical injuries are sustained or not. (ii) "Sexual abuse" includes:

1. incest;

2. rape;

3. sexual offense in any degree;

4. sodomy; and

5. unnatural or perverted sexual practices.

(b) Prohibited.—

(1) A parent or other person who has permanent or temporary care or custody or responsibility for the supervision of a minor may not cause sexual abuse to a minor.

(2) A household member or family member may not cause sexual abuse to a minor.

(c) Penalty.—A person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 25 years.

---

11. C.L. § 3-602 recodified without substantive change Md.Code (1957, 1996 Repl.Vol.), Article 27, Section 35C effective October 1, 2002. 2002 Md. Laws, Chap. 26.

(d) Sentencing.—A sentence imposed under this section may be separate from and consecutive to or concurrent with a sentence for:

(1) any crime based on the act establishing the violation of this section; or

(2) a violation of § 3–601 of this subtitle involving an act of abuse separate from sexual abuse under this section.

 While C.L. § 3–602 itself lists examples of sexual abuse, that list is not exclusive. *Tribbitt v. State*, 403 Md. 638, 657 n. 14, 943 A.2d 1260 (2008) ("The general terms, defining sexual abuse as 'an act that involves sexual molestation or exploitation . . .' precede the specific list of items[,] . . . provid[ing] even further indication that the [Maryland General Assembly] intended the list of items in § 3–602(a)(4)(ii) to be illustrative."). The sexual abuse can be committed through a single act or a continuing course of conduct consisting of multiple acts. *Cooksey v. State*, 359 Md. 1, 23–24, 752 A.2d 606 (2000) ("[T]he gravamen of the offense is not the sexual act itself, which is punishable in its own right under other statutes, but rather the abuse of the child[,] [which] can as easily arise from several qualifying acts as from one."). Furthermore, the act or acts amounting to the sexual abuse need not be criminal. *Tribbitt*, 403 Md. at 649, 943 A.2d 1260. Still, the statute does not define "sexual molestation" or "exploitation of a minor."

In 1963, "[t]he General Assembly first evidenced its concern with the mistreatment of children . . . when it added § 11A to Art. 27 of the Maryland Code, later codified as § 35A of that article, declaring an assault on a child to be a felony." *Pope v. State*, 284 Md. 309, 317, 396 A.2d 1054 (1979) (citing 1963 Md. Laws, Chap. 743; 1970 Md. Laws, Chap. 500). "[W]hen the crime [of child abuse] was first created by the General Assembly[,] it comprised the malicious beating, striking or otherwise mistreating a child to such a degree as to require medical treatment." *Id.* at 318, 396 A.2d 1054. In 1973, the General Assembly amended the child abuse statute to provide "that whenever 'abuse' was used in § 35A, it shall mean 'any

physical injury or injuries sustained by a child as a result of cruel or inhumane treatment or as a result of malicious act or acts . . . .' " *Id.* The amendment was intended "to include in the offense 'any sexual abuse of a child, whether physical injuries are sustained or not.' " *Id.* (quoting 1974 Md. Laws, Chap. 554). The amendment also defined " 'sexual abuse' to mean 'any act or acts involving sexual molestation or exploitation, including but not limited to incest, rape, carnal knowledge, sodomy or unnatural or perverted sexual practices on a child . . . .' " *Id.* (quoting 1974 Md. Laws, Chap. 554). The General Assembly replaced "carnal knowledge" with "or sexual offense in any degree." *Id.* (citing 1977 Md. Laws, Chap. 290). The Court of Appeals, applying the rules of statutory construction, concluded that it was " 'evident that the [General Assembly] plainly intended to broaden the area of proscribed conduct punishable in child abuse cases.' " *Id.* at 319, 396 A.2d 1054 (quoting *State v. Fabritz*, 276 Md. 416, 423–24, 348 A.2d 275 (1975)).

In *Brackins v. State*, 84 Md.App. 157, 161, 578 A.2d 300 (1990), applying the prior statute, we held that the General Assembly, "in enacting child abuse statutes, recognizes society's interest in protecting the privacy, health, and emotional and psychological welfare of its children." "Exploitation of children, through child pornography or sexual molestation and abuse, victimizes the children and possibly causes future psychological harm." *Id.* (citing *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)) (other citations omitted). Looking at the plain, dictionary meaning, we defined "exploitation" to occur when "the parent or person having temporary or permanent custody of a child took advantage of or unjustly or improperly used the child for his or her *own* benefit." *Id.* at 162, 578 A.2d 300 (emphasis in original). In that case, the defendant " 'exploited' the child when he partially disrobed her for his own pleasure or amusement or gratification or interest[,]" amounting to sufficient evidence to convict under the predecessor to C.L. § 3–602. *Id.*

In *Degren v. State*, 352 Md. 400, 722 A.2d 887 (1999), the Court of Appeals addressed whether a wife could be convicted

of child sexual abuse under the predecessor to C.L. § 3–602 for her failure to prevent her husband from sexually molesting or exploiting a minor. The Court considered "the purpose of the child abuse statute, the amendments in which the [l]egislature generally expanded the scope of liability and actions constituting child abuse . . . and the modern trend in broadly recognizing and punishing all forms of child abuse[.]" *Id.* at 424, 722 A.2d 887. The Court concluded that "the definition of sexual abuse in [Md.Code (1957, 1996 Repl.Vol.), Article 27, Section 35C(a)(6)(i) ] contemplates not just an affirmative act in directly molesting or exploiting a child, but one's omission or failure to act to prevent molestation or exploitation when it is reasonably possible to act and when a duty to do so . . . exists." *Id.* at 424–25, 722 A.2d 887. The Court noted that the "word 'involves' connotes a broad sense of inclusion, such as an act *relating* to sexual molestation or exploitation [and] expand[ed] the scope of the word 'act' from just the deed of molestation or exploitation into something done by the accused that relates to the molestation or exploitation." *Id.* at 419, 722 A.2d 887. Moreover, "[b]y clarifying that sexual abuse need not necessarily lead to physical injuries in order to be prosecuted, the legislature recognized the extensive emotional, psychological, or physical damage that sexual abuse can cause a child[.]" *Id.* at 421, 722 A.2d 887. "[T]he General Assembly, through its various changes to the language of the [child sexual abuse] statute, consistently expanded [the statute's] scope and applicability to better achieve the goal of protecting 'children who have been the subject of abuse.' " *Id.* at 419, 722 A.2d 887 (quoting 1973 Md. Laws, Chap. 835 (title clause)).

Later, in *Tate v. State,* 176 Md.App. 365, 379, 933 A.2d 447 (2007) (*"Tate I "*), *cert. granted,* 405 Md. 63, 949 A.2d 652, *vacated and remanded,* 405 Md. 106, 950 A.2d 100 (2008); 182 Md.App. 114, 957 A.2d 640 (2008) (*"Tate II "*), we held that unlike a fourth-degree sexual offense, which requires "a very particularized specific intent or special *mens rea* [,]" "sexual abuse of a minor pursuant to [C.L.] § 3–602 does not involve any specific intent or special *mens rea."* In that case, the jury acquitted the defendant of fourth-degree sexual offense, but

convicted the defendant of sexual abuse of a minor, based on the victim's testimony that the defendant "rubbed outside [her] vagina." *Tate I*, 176 Md.App. at 375, 933 A.2d 447. For a fourth-degree sexual offense, "[t]he intentional touching, whatever its scope, must be perpetrated 'for sexual arousal or gratification, or for the abuse of either party.'" *Tate I*, 176 Md.App. at 379, 933 A.2d 447. Conversely, "[t]here is no comparable mental requirement in the sexual child abuse law." *Id.* As such, sexual child abuse of a minor is broader than a fourth-degree sexual offense. *Tate II*, 182 Md.App. at 124, 957 A.2d 640. We reiterated that "[a]lthough 'sexual abuse' includes . . . five statutorily listed examples, it most definitely is not limited to those examples." *Tate I*, 176 Md.App. at 375–76, 933 A.2d 447; *see also Degren*, 352 Md. at 428, 722 A.2d 887. Additionally, "[t]he non-commission of so much as a single one [of the statutorily listed examples] does not necessarily imply the non-commission of [sexual abuse of a minor]." *Id.* at 377, 933 A.2d 447. We recognized that a defendant may touch a minor in such a manner to constitute "sexual molestation or exploitation," without amounting to "sexual contact" for fourth-degree sexual offense, because the contact may not be for "sexual arousal or gratification, or for the abuse of either party." *Id.* at 376–81, 933 A.2d 447. In fact, in light of the defendant's own testimony, we noted that "[i]t takes no stretch of the imagination to conclude that the jury may have found the [defendant's] behavior to have been inappropriate but may also have believed the [defendant] that his actions were not motivated by 'sexual arousal or gratification.'" *Id.* at 380, 933 A.2d 447 (quoting C.L. § 2–301(f)(2)(ii)).

Our holdings in *Tate I* and *Tate II* indicate that there is no specific *mens rea* requirement for sexual abuse of a minor under C.L. § 3–602, but we must determine whether appellant's *actus reus* amounted to sexual abuse of a minor.

The body of Maryland case law addresses varieties of physical contact with a minor child and whether that physical contact amounted to sexual molestation or exploitation. *See, e.g., Crispino v. State*, 417 Md. 31, 45, 7 A.3d 1092 (2010) (french kissing a minor for ten minutes while on top of her in

bed); *Tribbitt,* 403 Md. at 642, 943 A.2d 1260 (teacher and coach grabbing a student's buttocks and inner thighs, rubbing her vaginal area, and sticking his hand down her pants); *Degren,* 352 Md. at 424, 722 A.2d 887 (a wife's failure to prevent her husband from abusing a minor child); *Tate I,* 176 Md.App. at 374, 933 A.2d 447 (stepfather putting hands in sixteen-year-old stepdaughter's underwear and rubbing the area around her vagina); *Brackins,* 84 Md.App. at 161–62, 578 A.2d 300 (stepfather requesting that twelve-year-old step-daughter unbutton blouse and taking photograph of her exposed breasts). Nevertheless, the Court of Appeals has recognized that the General Assembly intended for C.L. § 3–602 and its predecessor to "cover a wide range of conduct." *Crispino,* 417 Md. at 43, 7 A.3d 1092. In *Crispino,* 417 Md. at 43, 7 A.3d 1092 (quoting *Degren,* 352 Md. at 419–21, 722 A.2d 887), the Court recently reiterated the broad scope of the statute.

> [W]e noted that the "word 'involves' connotes a broad sense of inclusion, such as an act *relating* to sexual molestation or exploitation," and "expand[ed] the scope of the word 'act' from just the deed of molestation or exploitation into something done by the accused that relates to the molestation or exploitation." We further observed that, "[b]y clarifying that sexual abuse need not necessarily lead to physical injuries in order to be prosecuted, the [L]egislature recognized the extensive emotional, psychological, or physical damage that sexual abuse can cause a child", and "through its various changes to the language of the statute, consistently expanded its scope and applicability to better achieve the goal of protecting 'children who have been the subject of abuse.' "

(Internal citations omitted).

 Appellant posits that to avoid C.L. § 3–602 being void for vagueness, we must interpret the statute to require that the defendant acted for the purpose of achieving or obtaining sexual arousal or gratification. *See Moss v. Director, Patuxent Institution,* 279 Md. 561, 566, 369 A.2d 1011 (1977) ("We are also mindful of the familiar principle of law whereby if

there are two reasonable constructions that can be placed upon a statute, one of which will result in its unconstitutionality and the other of which will not, we must construe the enactment so as to avoid conflict with the State or Federal Constitutions."). "The void-for-vagueness doctrine as applied to the analysis of penal statutes requires that the statute be 'sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties.' " *Galloway v. State*, 365 Md. 599, 614, 781 A.2d 851 (2001) (quoting *Williams v. State*, 329 Md. 1, 8, 616 A.2d 1275 (1992)). We disagree with appellant's characterization that he was convicted of sexual exploitation without committing an overtly sexual act because a rational fact-finder could easily determine that the content and sheer volume of appellant's letters to C.B. constituted exploitative behavior.

Based on what appellant characterizes as a lack of precedential authority in Maryland, he directs our attention to an out-of-state case for the proposition that his conduct, though certainly reprehensible, did not amount to sexual exploitation. In *Sullivan v. State*, 766 P.2d 51, 56 (Alaska Ct.App.1988), the Alaska Court of Appeals held that evidence that the defendant wrote notes to a minor asking her to "be my girlfriend," "kiss me," let him "feel" and "kiss" her "private parts," and "take off [her] clothes" "establishe[d] only that [he] engaged in preparatory conduct and not that he took a substantial step toward sexual conduct" with the minor as required for attempted sexual abuse of a minor. However, in *Braun v. Alaska*, 911 P.2d 1075 (Alaska Ct.App.1996), that Court elaborated on its decision in *Sullivan*. There, the defendant appealed his convictions of second-degree sexual abuse of a minor and attempted second-degree abuse of a minor, arguing that there was insufficient evidence to support these convictions. *Braun*, 911 P.2d at 1077. The Court held that evidence of the defendant touching several children underneath their clothing and asking to take photographs of them naked was sufficient to support his convictions because the Alaska legislature had expressly removed the requirement that the "sexual contact" be with the "intent to obtain sexual gratifica-

tion." *Id.* at 1078 (citing *Van Meter v. Alaska,* 743 P.2d 385, 389–91 (Alaska Ct.App.1987)). Therefore, we do not find *Sullivan* persuasive.

Appellant also cites out-of-state statutes that limit sexual exploitation of children to the creation of child pornography. *See* 18 U.S.C. § 2251; Alaska Stat. § 11.41.455; Ariz.Rev.Stat. § 13–3553; Ga.Code § 16–12–100; Iowa Code § 728.12; 17–A Me.Rev.Stat. § 282; N.C. Gen.Stat. § 14–190.16; S.C.Code § 16–15–395; Tenn.Code § 39–17–1003; Utah Code § 76–5b–201; Wash. Rev.Code § 9.68A.040; *see also* 720 Ill. Comp. Stat. 5/11–9.1(a) ("A person commits sexual exploitation of a child if in the presence or virtual presence, or both, of a child and with knowledge that a child or one whom he or she believes to be a child would view his or her acts, that person: (1) engages in a sexual act; or (2) exposes his or her sex organs, anus[,] or breast for the purpose of sexual arousal or gratification of such person or the child or one whom he or she believes to be a child" or a person "knowingly entices, coerces, or persuades a child to remove the child's clothing for the purpose of sexual arousal or gratification of the person or the child, or both."); Iowa Code § 709.15(3) ("Sexual exploitation by a school employee occurs when any of the following are found: a. A pattern or practice or scheme of conduct to engage in any of the conduct described in paragraph 'b'. b. Any sexual conduct with a student for the purpose of arousing or satisfying the sexual desires of the school employee or the student. Sexual conduct includes but is not limited to the following: kissing; touching of the clothed or unclothed inner thigh, breast, groin, buttock, anus, pubes, or genitals; or a sex act as defined in section 702.17.") However, Maryland has not enacted legislation that limits sexual exploitation of children to the creation of child pornography.

Simply because prior Maryland case law has dealt with sexual abuse of a minor through overtly sexual physical acts does not restrict our application of C.L. § 3–602. Specifically, in *Brackins,* 84 Md.App. at 161, 578 A.2d 300, we stated that the legislature, "in enacting child abuse statutes, recognizes society's interest in protecting the privacy, health, and emo-

tional and psychological welfare of its children." We recognized that "[e]xploitation of children, through child pornography or sexual molestation and abuse, victimizes the children and possibly causes future psychological harm." *Id.* (citing *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); *State v. Beckman*, 547 So.2d 210 (Fla.Dist.Ct. App.1989); *Ex Parte Felton*, 526 So.2d 638 (Ala.1988); *Commonwealth v. Ludwig*, 366 Pa.Super. 361, 531 A.2d 459 (1987); *State v. Meadows*, 28 Ohio St.3d 354, 503 N.E.2d 697 (1986); *People v. Green*, 94 Cal.App.3d Supp. 1, 156 Cal.Rptr. 713 (1979)). We then defined "sexual exploitation" to have occurred when "the parent or person having temporary or permanent custody of a child took advantage of or unjustly or improperly used the child for his or her *own* benefit." [12] *Id.* at 162, 578 A.2d 300. Furthermore, "[t]o be convicted of exploitation and, therefore, child abuse, threats, coercion, or subsequent use of the fruits of the acts are not necessary." *Id.* Nowhere in *Brackins* nor any other case in Maryland have Courts required that the benefit be sexual gratification or sexual benefit. Indeed, we have stated that "sexual abuse of a minor pursuant to [C.L.] § 3–602 does not involve any specific intent or special *mens rea.*" *Tate I*, 176 Md.App. at 379, 933 A.2d 447; *see also Tate II*, 182 Md.App. at 121, 957 A.2d 640 (A violation of C.L. § 3–602 "arguably requires no more than objective behavior that has an adverse sexual impact on the

---

**12.** To reach our conclusion, we quoted the following definitions of "exploitation":

"To take advantage of.... To make use of meanly or unjustly for one's own advantage or profit.... Unjust or improper use of another person for one's own profit or advantage." *Webster's Third New International Dictionary, 1976 Edition.*

"To make use of.... To make unethical use of for one's own advantage or profit." *Webster's New World Dictionary, Third College Edition* (1988).

"Taking unjust advantage of another for one's own advantage or benefit." *Black's Law Dictionary* (5th Ed., 1979).

"The utilization of another person for selfish purposes.... To employ to the greatest possible advantage (exploit).... To make use of selfishly or unethically." *The American Heritage Dictionary of the English Language* (1969).

*Brackins*, 84 Md.App. at 161, 578 A.2d 300.

victim," while "a fourth-degree sexual offense ... requires subjectively that the sexual conduct be committed with the specific intent of producing 'sexual arousal or gratification.'").

The circuit court was well aware of this broad definition of sexual abuse and the legislative intent behind C.L. § 3–602. Its finding that appellant exploited C.B. within the meaning of C.L. § 3–602 was not erroneous. The court relied on the totality of the circumstances, which included appellant's interactions with C.B., the content and sheer volume of the notes and letters, and the obvious emotional distress C.B. suffered as a result of appellant's actions. The court stated, "It's hard to read these letters, including the totality of these letters, and not find that they were sexual from the standpoint that the passionate comments ... almost border on obsession, contained expressions of jealousy[,] and certainly had sexual undertones."

The circuit court held that appellant had temporary care or custody or responsibility for the supervision of C.B., and appellant does not challenge such a finding on appeal. *See Ellis v. State,* 185 Md.App. 522, 541–50, 971 A.2d 379 (2009) (holding that teacher had temporary care or custody or responsibility for supervision of student, even though student was not in teacher's class). The court also concluded that appellant "took advantage of [C.B.] and unjustly and improperly used her for his own benefit," exploiting her within the ambit of C.L. § 3–602. Viewing the evidence in the light most favorable to the State, we cannot conclude that the circuit court was clearly erroneous in its fact-finding. In our own *de novo* review of the statutory and case law, we hold that the circuit court did not err in its determination that the State proved beyond a reasonable doubt that appellant, through the totality of his actions and correspondence with C.B., exploited her pursuant to C.L. § 3–602 and had an adverse sexual, emotional, and psychological impact on her. *See Tate II,* 182 Md.App. at 121, 957 A.2d 640. There was sufficient evidence that appellant's interactions with C.B. and his notes and letters with sexual undertones fell within the ambit of C.L. § 3–602, as the actions involved sexual exploitation. *See*

*Crispino*, 417 Md. at 43, 7 A.3d 1092 (quoting *Degren*, 352 Md. at 419, 722 A.2d 887) (" '[I]nvolves' connotes a broad sense of inclusion, such as an act *relating* to sexual molestation or exploitation[.]"). Appellant "took advantage of or unjustly or improperly used [C.B.] for his ... *own* benefit" as the sheer volume of letters evidenced a fascination or attachment of a sexual nature. *See Brackins*, 84 Md.App. at 162, 578 A.2d 300. Moreover, appellant's actions clearly had an extensive emotional or psychological impact on C.B., which the General Assembly sought to prevent in its enactment and various amendments to C.L. § 3–602 "to better achieve the goal of protecting 'children who have been the subject of abuse.' " *Crispino*, 417 Md. at 44, 7 A.3d 1092 (quoting 1973 Md. Laws, Chap. 835 (title clause)).

Appellant urges us to adopt "[t]he general definition of 'sexual exploitation' [as] '[t]he use of a person, esp[ecially] a child, in prostitution, pornography, or other sexually manipulative activity that has caused or could cause serious emotional injury.' " *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. West Lake Academy*, 548 F.3d 8, 15 (1st Cir.2008) (quoting Black's Law Dictionary 1407 (8th ed.2004)). We are not persuaded, however, because Maryland courts have already adopted a definition of exploitation. *See Brackins*, 84 Md.App. at 161, 578 A.2d 300 ("To be convicted of exploitation ... [t]he State need only prove, beyond a reasonable doubt, that the ... person having temporary or permanent custody of a child took advantage of or unjustly or improperly used the child for his or her *own* benefit."). Yet, even accepting appellant's favored definition of exploitation, we cannot hold that the circuit court erred in concluding that appellant exploited C.B. Through the totality of appellant's actions and letters, the State provided sufficient evidence that appellant used C.B. for " 'sexually manipulative activity that has caused or could cause serious emotional injury,' " as evidenced by the testimony of C.B., her mother, her principal, and her teachers. *Id.* (quoting Black's Law Dictionary 1407 (8th ed.2004)). Therefore, we hold that appellant's actions and letters, in conjunction with the impact

on C.B., supplied a sufficient basis for the circuit court to convict him of sexual abuse of a minor under C.L. § 3–602.

Finally, we point out that in *Cooksey v. State*, 359 Md. at 24 n. 1, 752 A.2d 606, the Court of Appeals noted that "touching a person's buttocks" or "rubbing against the victim" clearly represented "sexual molestation or exploitation" to constitute sexual child abuse, even though it would be questionable whether the same acts amounted to sexual contact for a sexual offense. In *Tate I*, 176 Md.App. at 378, 933 A.2d 447 (quoting *Cooksey*, 359 Md. at 24 n. 1, 752 A.2d 606), we noted:

> Section 461(f) of Article 27 [from which § 3–301(f) is derived without substantive change defining sexual contact] includes within the definition of "sexual contact" *the intentional touching of the victim's anal or genital areas* or other "intimate parts" for the purpose of sexual arousal or gratification. *Whether the touching of a person's "buttocks" would suffice as sexual contact is not clear. It might,* however, depending on the circumstances, *constitute sexual molestation or exploitation, even if it did not constitute sexual contact. The same situation could arise from "rubbing against"* the victim.

(Emphasis in *Tate I* ). Similarly, while there was no evidence that appellant's interactions with C.B. fell within the scope of "sexual contact" for a sexual offense, the magnitude of the conduct provided sufficient evidence for the circuit court to convict appellant of sexual abuse of a minor under C.L. § 3–602.

**JUDGMENTS OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**